Booth, Judge,
delivered the opinion of the court.
Plaintiff company on April 14,1908, entered into a written contract with the proper officers of the United States to complete Dry Dock No. 4 at the Brooklyn Navy Yard. George B. Spearin was the original contractor for the construction *369 of the dock, and had proceeded to some extent toward its completion when he encountered difficulties with the defendants, resulting in the annulment of his contract on November 14, 1907. The plaintiff’s obligation imposed upon it the necessity of tailing up the construction work on the dock at the point where Spearin left off. On April 14, 1908, the date of the execution of the contract in suit, the defendants contemplated changes of material consequence in the size and detail construction of the dock. The plaintiff was advised of this fact and did not vigorously enter into the performance of any substantial construction work on the same. What little it did do was of a general nature and more in anticipation of future events than material progress toward completion of its contract work. On August 31, 1908, supplemental agreement No. 1314-A was executed by the parties. This new contract embraced the contemplated changes and with subsequent additions increased the plaintiff’s compensation from $764,400 to $1,247,029.98 and extended the time for the completion of the contract work to 32 calendar months from the date of this agreement.
Without going into the infinite detail of the record, it is obvious from the briefs and argument of the case that the issue presented is in many respects similar to the contentions advanced in the case of Spearin v. United States, 248 U. S. 132. The plaintiff, with at least the passive acquiescence and approval of defendants’ officers, proceeded with its work until March 1,1909. On this date the defendant’s civil engineer in charge of the work manifested a grave doubt as to the plaintiff’s ability to complete the dock within the time allowed by the contract, and so notified the Chief of the Bureau of Yards and Dock. The impending crisis, which must necessarily result in the annulment' of the plaintiff’s contract, was at this time averted by a mutual arrangement ’ of the parties, formulated in Washington, in the office of the Assistant Secretary of the Navy, on March 12, 1909. At this formal conference the plaintiff acceded to the requests of the defendants, all of which were made in good faith and obviously intended to enable it to escape the penalty of forfeiture and facilitate its performance of the contract work. Four especial items were agreed to. The plaintiff employed *370 and vested in Civil Engineer Wentworth complete authority over and supervision of the contract work, deposited$100,000 in a designated depositary as a guarantee of its financial ability, agreed to the accomplishment of a certain percentage of contract work within 90 days, and obligated Civil Engineer Wentworth to keep the defendants informed in the event the plaintiff failed to supply him with sufficient resources, both in laborers, material, and funds, to complete the contract. ' This commendable composition of their mutual disputes and difficulties seemed destined to bring results, and did operate beneficially until the early part of June, 1909. While the plaintiff on numerous occasions complained of an excess of leakage and water fioAving into the area of excavation, nothing of a real serious nature had hindered their progress until June 19, 1909. As a matter of fact, the defendants’ officers made no serious objections to the plaintiff’s observance of the terms of the formal conference of March 12, 1909, until subsequent to the controversy, which must now be discussed.
Passing in a semicircle around the head of Dry Dock No. 4 was a 6-foot intercepting brick sewer, which had been constructed by George B. Spearin under his contract. On August 7, 1906, this sewer, during a heavy downpour of rain, burst and little or nothing had been done to repair the same. It remained substantially as it was after the storm — a seriously impaired and inefficient sewer. “Lying to the eastward about 150 feet, generally parallel with the axis of the dock, was a 7-foot sewer near the head of said site,” intercepted by the 6-foot sewer at a point outside the limits of the contractor’s lines of work. Near the point of interception with the 7-foot sewer, inside the 6-foot sewer, was a sluice gate of sufficient size and dimensions to prevent the flowage of sewage or water from the 7-foot sewer through the 6-foot sewer; and likewise in the 7-foot sewer was a similar sluice gate which, when closed, diverted the flowage from the 7-foot sewer into and through the 6-foot sewer. Both of these sewers were an integral part of the sewerage system of the city of Brooklyn, and notoriously inefficient. The officers of the navy yard, including those in charge of the construction of the dry dock, were fully *371 cognizant of tliis fact. George B. Spearin’s difficulties were wholly due to this condition, and for many years they had been the source of constant trouble and concern to those responsible for Government property at the navy yard. Civil Engineer Wentworth knew of and appreciated the danger incident to their presence and condition, for as soon as he came on the work he closed the sluice gate in the 6-foot sewer and opened the one in the 7-foot sewer, thus diverting all the flowage into the 7-foot sewer, and about the same time requested the defendants to erect a dam or sluice gate in the 6-foot sewer some 400 feet to the west of the dock, to prevent the water from flowing back therein at times of high tide in the East' River.
Civil Engineer Gregory, in charge for the defendants of the construction of Dry Dock No. 4, some time between June 19 and 23, 1909, ordered the plaintiff’s engineer, Went-worth, to open the sluice gate in the 6-foot sewer and close the sluice gate in the 7-foot sewer. Wentworth protested and declined to obey. A preliminary verbal order was supplemented by a written one. Still the company’s engineer declined to obey; but finally the sluice gate in the 6-foot sewer was opened and the 7-foot sewer was closed, resulting in a continual flowage of all the sewage theretofore passing through the 7-foot sewer into the 6-foot sewer, and a serious and damaging leakage into the plaintiff’s excavation. Not only was the plaintiff continually menaced by this steady and uninterrupted flowage of sewage thus diverted in its direction, but on June 28, 1909, a short but severe storm augmented the flowage to such an extent that the whole area of excavation was completely submerged and the plaintiff’s working plant substantially drowned out. It occupied the plaintiff’s time from the date of the storm until July 12, 1909, in removing the sand, pumping out the water, and restoring its machinery, due to the overflow and leakage in the 6-foot sewer. The sluice gate in the 6-foot sewer was subsequently closed and kept closed until July 16, 1909, when another very heavy precipitation of rain overflowed the 7-foot sewer, and while hindering the plaintiff to some extent, would not have proven serious save for the fact that the sluice gate in the 6-foot sewer was again at this time *372 opened, with its corresponding results. It was physically impossible in the face of this situation for the plaintiff to advance with its work with the necessary degree of rapidity and burdened it with such a quantity and quality of extra work that fully warranted apprehension of its inability to complete the dock, on time. Not alone were delays vexatious, but the status quo of what work had been done could not be maintained, and the situation, in conjunction with other difficulties, finally resulted in the annulment of the plaintiff’s contract.
In addition to this source of annoyance the company was compelled to contend against leakage from a 30-inch saltwater main laid some years before by the officials of the navy yard to convey water to the electric power station located some 75 feet south and a little west from the line of the company’s area of operations. This main had been improperly supported, and at a point where it passed under the 6-foot -intercepting sewer a curved joint became separated and allowed a considerable quantity of salt water to seep into the excavation. This joint was cumbersomely made, and upon examination disclosed that it did not comply with the usual rules of good workmanship. Almost directly opposite the middle, on the east side of the dock, two small sewers had been laid by the defendants, intended to carry sewage from some of the buildings of the navy yard by intercepting the large 7-foot sewer heretofore described. These two sewers were found on investigation to be wholly inefficient, and by reason of faulty connections served only to empty the greater portion of their contents into the sandy soil adjoining the supposed point of connection, and from there seep through into the area of excavation made by the plaintiff.
Whatever may have been the cause, it is a conceded fact that for a short time, about August 1, 1909, a total volume of more than 250,000 gallons of water and sewage escaped daily from under the 7-foot sewer and percolated through the sandy soil adjoining the dock, serving the purpose of an incessant menace as well as actual hindrance to the plaintiff company in making satisfactory progress toward the completion of its contract work.
*373 The officers of the defendants in July, 1909, investigated the condition of the 80-inch salt-water main and discovered the defects heretofore set forth. In August, 1909, an investigation was made as to the complaints of the company in reference to leakage from the sewers, and resulted in establishing the conditions set forth in the findings.
On August 17, 1909, the defendants’ civil engineer in charge of the contract work condemned the cable towers employed by the plaintiff for transporting materials into the excavation and sand and dirt to the scows in Wallabout Basin. The company was notified to discontinue their use, as they were deemed unsafe and dangerous to the employees. The plaintiff complied with the notice, and submitted plans for a substitute plant. A poignant dispute arose over what is seemingly a simple issue — the company insisting that the defendants should remove the cable towers from the site of the work, and the defendants insisting to the contrary. Nothing was clone by either party and the condemned towers remained as they were. The cable towers were the property of George B. Spearin, and had been taken over by the defendants at the time of the annulment of the Spearin contract. The plaintiff company had been allowed to use them upon a basis of $10,000 compensation for such use. It was in effect a lease of the property to the company.
The final cause of complaint alleges a failure to comply with the pay stipulation of the contract. This provision obligated the defendants to making monthly payments predicated upon prior estimates of work done. The defendants withheld the vouchers for July, August, and September, 1909. According to their own figures the amount involved is $24,932.06. Justification for so doing is rested upon the impairment of work already in place covered by said estimates. The record establishes beyond doubt a movement of concrete previously placed, and due to the caving in of the side walls of the excavation, as well as flooding of the same through the faulty sewers before'mentioned.
By reason of the conditions stated the plaintiff company asserts a bill of damages totaling the sum of $419,362.77, for which amount it now sues. In arriving at said sum the company particularizes by proving numerous items of in *374 creased cost of construction caused by flooding, as' well as the value of materials taken over by the defendants subsequent to the annulment of their contract, including the loss of profits on the undertaking as a whole.
The plaintiff’s contract was annulled by the Secretary of the Navy on October 1, 1909, under the provision of section 15 of the same. Preceding the annulment some correspondence passed between the officials of the defendants and the company’s officers. The controversy revolved around the defective sewer system, the company finally asserting an unwillingness to proceed without adequate protection from further flooding and seepage from the sewers, coupled with the minor complaints heretofore set forth.
The issue involved in the present litigation is not identical in every respect with the Spearin case. The plaintiff obligated itself to complete the Spearin contract, and hence came on the work with the conditions resulting from Spear-in’s failure openly confronting it. The plaintiff was charged by the terms of its contract to investigate the situation and ascertain the difficulties incident to the undertaking, and no misrepresentation of material facts is alleged or proven. The broken and dilapidated 6-foot sewer was in open view, directly across the head of the proposed dock, and within the area set aside by the defendants for the contractor’s operations. Its presence under all the circumstances was a warning of danger, without even any comment as to its condition. When one approaches a railroad track the track itself suggests the possibility of injury, and the exercise of due care and caution is incumbent upon one who complains of injury inflicted by a passing train. So it was with this sewer. The plaintiff knew it was contracting to complete a partially executed contract work which a previous contractor had failed to complete by reason of the presence across the site of the work of this very sewer. It was a duty imposed by law, as well as by the express terms of the contract in suit, upon plaintiff to take into consideration the assumed risks which obviously might add to the difficulties of its undertaking or provide against the contingencies possible to occur by express stipulations in the contract. This the plaintiff did not do.
*375 A more troublesome question arises as to the responsibility for the extensive and vexatious hindrances and difficulties occasioned by the sewers outside the limits marked out for the plaintiff’s contract work. A certain defined area was set aside and fenced in for the occupation of the plaintiff. Within the limits thus specified the plaintiff was to construct the dock, deposit materials, and confine its plant. Outside this area was the 7-foot sewer lying along and extending the full length of the proposed dock; it was part of the general sewerage system of the city df Brooklyn and was notoriously inefficient. The defendants had attempted to intercept the sewer by the construction of two 12-inch sewers described in the findings, which manifestly augmented plaintiff’s difficulties and increased the seepage into the area of excavation. It is not and could not be successfully contended that the defendants were in anywise directly responsible for either the presence or the condition of the 7-foot sewer; the city of Brooklyn was legally in control. The sewer was there, the plaintiff might have ascertained the fact, and inasmuch as the very nature of his contract work would be seriously affected by seepage or water it seems to us the plaintiff necessarily assumed the risk of existing structures which might render its contract work more difficult and expensive. The general rule of law applicable to contractual undertakings is that, having assumed an obligation to perform a certain specific work, the obligation must be discharged unless prevented by the act of God or the acts of the other party. Dermott v. Jones, 2 Wall. 1. Latent defects in the soil will not relieve the contractor. Simpson v. United States, 172 U. S. 372.
If the plaintiff assumed the risk of existing structures within the area of its contract work outside and adjacent thereto, was the plaintiff not entitled to the use of all the instrumentalities connected with and a part of said structures to prevent them from contributing to its injury, and the correlative right to maintain them in the fixed condition in which they were found at the time it entered upon its' contract? In other words, the two things being equal, the defendants could not by any act of theirs change the' status quo to the injury of the plaintiff. It would seem hardly *376 necessary to assert that the defendants could not, after the plaintiff entered upon its contract work, divert the sewage, and water from the 7-foot sewer in such a' way as to destroy the plaintiff’s work in place or flood its extensive excavation. While the plaintiff assumed the hazards of its undertaking from all existing sources, the defendants could not. by any act of theirs increase the same or deny it the use and benefit of existing instrumentalities to forestall Avhat without such use meant inevitable ruin and disaster. The plaintiff discovered upon investigation that within both the 6-foot and 7-foot sewers, near the point of interception, were sluice gates. By closing the one in the 6-foot sewer (which it had express permission to do) and opening the one in the 7-foot sewer a diversion of both sewage and water from the 7-foot sewer could be effectually forestalled and the menace of leakage from the broken 6-foot sewer minimized to almost á negligible extent. The plaintiff did this very thing and actual results of a beneficial character followed. The defendants deliberately and designedly, with full knowledge of the dilapidated condition of the 6-foot sewer, forbade a continuance of this condition, denied the plaintiff the right to avail itself of this protective feature, closed the sluice gate in the 7-foot sewer, opened the one in the 6-foot sewer, and thereby precipitated down into and upon plaintiff’s extensive excavation a tremendous volume of water and sewage which drowned out its plant and seriously injured its work in place. By so doing the defendants not only caused the plaintiff to assume responsibility for the normal flow of sewage through the 6-foot sewer but added to the same both the normal and flood flow of the 7-foot sewer. Not content with the results manifest from the first offense, it was again repeated, and while the injury the second time was not so extensive, due to a slighter rainfall, it was probable and possible.
It is inconceivable that a contractor should be required to contend against such hostile conduct when engaged in the construction of contract work involving a total cost in excess of $1,000,000, and the ultimate success of which depended absolutely upon the maintenance of dry conditions in so far as naturally obtainable. The excavation of an extensive area in sand adjoining a body of water was the first *377 work the contractor must do; all that followed took placé in this same area, and the prime importance of keeping it free from water or seepage taxed the ingenuity of the contractor, eren under normal conditions. The reason given for diverting the flowage from the 7-foot sewer into the 6-foot sewer is predicated upon health and sanitary conditions at Wallabout Basin, the Government having erected a naval hospital at this point. There is no other rational hypothesis upon which it can be predicated. If the defendants intended to seriously alter the sewerage system in the waj' they did, it was incumbent upon them to so notify the plaintilf before it entered into its contract. An implied warranty obtained, upon which the plaintiff .had a legal right to rely, that existing conditions would not be altered to its detriment by the defendants during .the course of its contract work. It is not disputed, and can not be, that the defendants deliberately and designedly, with full knowledge of existing conditions and results, preferred the alternative of diverting this immense volume of water into the broken and inefficient 6-foot sewer, and thereby flood and injure the plaintiff’s work and plant, rather than continue the alleged annoyance and injury said to result from offensive odors emitted at the mouth of the 7-foot sewer where it emptied into Wallabout Basin. Of the choice of two evils the defendants accepted the one which added to and materially increased the financial and physical burdens of the plaintiff rather than remove their patients from the hospital until the dry dock was completed. The natural and intended outlet of the 7-foot sewer was Wallabout Basin. The engineers who constructed the same had selected the place and made the grades accordingly. The plaintiff had the legal right ■ to the maintenance of said condition, and the defendants could not alter them to its detriment, without its consent, without breaching the contract. The cost of the extra work ensuing from this fact the plaintiff is entitled to recover. In addition thereto the delay occasioned in the performance of the work, if it was material, is to be credited to the plaintiff. The damages suffered by the plaintiff from this cause, exclusive of all other leakage and seepage due from the general deficiency of' the Brooklyn sewer system *378 as a whole, as well as that occasioned by the salt water main, are $9,210, which amount will be included in the judgment of the court.
The stubborn insistence over the removal of the cableways was a dispute which might well have been avoided. The facts are set forth in Findings XXV. The second provision of the contract provided for the taking over by the contractor of “the plant, machinery, tools, and appliances belonging to Spearin;” and after reciting the contractor’s liability for their proper care and attention, specified as to their return in the following language: “ and shall be returned to the custody of the party of the second part in parts from time to time or in full upon the completion of the work covered by this contract, in their present condition, wear and tear excepted.” The civil engineer in charge of the work for the defendants condemned the cableways as dangerous to life and forbade their future use (which was an act of doubtful authority under the contract; the plaintiff had expressly assumed the burden of liability for any personal injury occasioned to employees or other persons about the work). The defendants had leased the same to the plaintiff for $10,000. The relative situation of the parties under these circumstances required the removal of the cableways by the defendants. After the cableways were condemned the plaintiff had open to him two methods of meeting the situation: First, it might repair the weakened and worn parts and continue to use them; second, it could substitute an entirely new plant in their stead. The plaintiff adopted the latter alternative and requested their removal out of the way of its work. The cableways, as heretofore shown, were the property of Spearin, and, aside from the necessity the defendants were under to return the property to Spearin, the very property itself was incapable of being delivered into the possession of the defendants in any other way than to notify them it was subject to their order and under their control. The plaintiff leased the property in the condition it was in when it returned the same to the possession and control of the defendants. The plaintiff was under no obligation by the terms of the contract to continue in possession of the cableways, and certainly none as to its *379 future preservation after it had been expressly forbidden to use it. The plaintiff delivered the cableways into the possession of the defendants in the same condition, ordinary wear and tear excepted, in which they were when taken over by it.
As a practical proposition it is difficult to comprehend the rigid adherence of the defendants to a first-formed determination not to remove the cableways out of the plaintiff’s way and thus facilitate its contract work. They had to be removed by the defendants at the conclusion of the contract, for it is obvious that the plaintiff would have been under no obligation to tear down and segregate into separate parts a cable system it leased in a standing and permanent position at the time it took it over. As a matter of fact and of law the defendants were obligated to take immediate possession of the cableways and towers and see to it that Spearin received them back, subject only to the loss occasioned by their usage. Just why they refused to do in August, 1909, what they must ultimately do is difficult of explanation, unless it is found in the letter of the civil engineer in charge of the work, wherein he acknowledges relinquishment of possession to the defendants and suggests that the plaintiff’s request for removal of the same “ be not complied with ” until some action of the department is taken with respect to annulling its contract. The plaintiff’s lease of the cableways covered a period of 36 months. They were condemned on August 17, 1909, after a user of 15-j,- months. The failure to withstand the use for which they were leased was in nowise attributable to the plaintiff; on the contrary, it was the result of conditions over which the plaintiff had no control; they were structurally inefficient. The plaintiff is entitled to judgment for the balance of the rental paid in advance for their user, which at the stipulated rental amounts to $5,691.00.
Section 29 of the contract provided the method of payment for the work as the same progressed. It is in the following language:
“Payments and reservations. — Monthly payments will be made by the Navy Department upon public bills, based upon monthly estimates and the schedule of prices above described, certified to by the civil engineer in charge and approved by *380 the Bureau of Yards and Docks. Ten per cent of the amount of .each monthly estimate will be withheld until the completion of the work and the same has been satisfactorily tested by a board of officers appointed for the purpose, and the dry dock and its accessories and appurtenances finally accepted by the Chief of the Bureau of Yards and Docks. All reservations thus withheld will then be paid upon public bills certified and approved as above, or so much as the contractors may be found entitled to upon a final accounting, but only after the execution of a final release to the United States in such form as shall be approved by the Chief of the Bureau of Yards and Docks of all claims of any kind or description under or by virtue of this contract.”
The defendants observed the express terms of this portion of the contract until July, 1909. Estimates were made for the July and August payment by the engineer in charge and duly transmitted to the Chief of the Bureau of Yards and Docks, but the latter official withheld their payment until he could satisfy himself that work completed and theretofore paid for in no wise involved in the estimates withheld should be determined of value to the defendants, and if it should prove valueless it was his intention to charge the same against the amount then due and payable. Whether or not the work previously estimated and paid for was valuable or valueless to the defendants depended upon the responsibility of the parties for the flooding of the plaintiff’s excavation in June and July, 1909. The defendants, of course, had determined this fact adversely to the plaintiff. There is nothing in the contract which expressly warrants a retention of these sums, and if it was done under any generally supposed authority to recoup anticipated damage from failure of the contractor’s work, it was necessarily so done at the defendants’ own peril, for if it subsequently turns out to be erroneous the terms of- the agreement have not been observed by the defendants. If the rule thus stated is correct, then the record herein establishes a breach of the contract, for not only was the work not valueless, but the cause of the injury is attributable to defendants’ conduct. In addition to this, the officers of the defendants withheld vouchers to the very substantial extent of $24,932.06, when the net value of the work against which they proposed to *381 make a charge, assuming its total unworthiness was but $20,165.35, leaving in any event the sum of $4,766.71 indisputably due the contractor and unpaid. None of this money was ever paid the contractor; it was held by the defendants until October 1, 1909, when the contract was annulled, and has since been withheld, presumably under clause 16 of the contract, although no further explanation has been offered for its detention. Overstreet v. United States, ante, p. 154.
Section 15 of the contract provides as follows:
“ Progress of work. — If at any time the progress of the work shall, in the opinion of the civil engineer in charge, appear to have been such as to indicate that the work is not likely to be completed within the time allowed, he shall report such opinion to the Chief of the Bureau of Yards and Docks, who may, in his discretion, declare the contract null and void, without prejudice to the right of the United States to recover for default therein or violations thereof.”
The following section enumerated in detail the power and authority granted the defendants subsequent to annulment. The terms of this section are decidedly drastic and visit upon the contractor, as liquidated damages, in case of annulment, an absolute loss of all compensation theretofore paid it, and delivers into the possession of the defendants its entire plant and materials on hand, with which to complete the dock, and in addition to this charges it with full responsibility for any excess expense incurred in the completion of the dock. The two sections of the contract in combination in-, volve a forfeiture of contract rights and property and erect a legal obligation to respond in damages for an amount depending upon future contingencies. The very language of the two sections, notwithstanding they have received the voluntary assent of the plaintiff, is such as to warrant the intendment that in the event of the necessity for invoking the power and authority therein granted, it will be done in absolute and manifest good faith, and only in consequence of such obvious defaults upon the part of the plaintiff as reduce the proposition to limits of reasonable certainty, and to' which defaults the defendants have by their conduct in nowise contributed. The structure to be constructed under the terms of this contract was one of vast importance to the *382 defendants. It was an undertaking of magnitude, experimental in some respects, and knowingly surrounded with difficulties and hazards, which required great skill and consistent foresight to overcome. Both parties to the contract were aware of all these facts, for the first attempt had resulted in a disastrous failure. Therefore, it was incumbent upon the defendants, before exercising the right of forfeiture to be certain of their ground and avoid the position of strenuously insisting upon the performance of the contract by the plaintiff in accord with its exact letter, while at the same time ignoring its terms themselves. The contract in no instance and under no circumstances authorized the Secretary of the Navy to annul it under clause 15. The civil engineer in charge of the work was, if in his opinion it could not be completed within the contract term, to so report to the Chief of the Bureau of Yards and Docks, and this official, with such information and report before him, might or might not annul the contract.
While no hearing was afforded the contractor under the contract, it did secure to it the judgment of the two very important officials directly connected with the actual work in progress before its contract could be terminated and its rights forfeited. This right is an important one to the plaintiff, as well as the defendants, and what was done by the Secretary of the Navy can not be justified upon the temporary absence of the Chief of the Bureau of Yards and Docks from his office, and under the circumstances of an express admission in the record that the Secretary knew absolutely nothing of the details of the contract work or the situation presented to him.
In the case of King v. United States, 37 C. Cls. 428, 436, this court said:
“As forfeitures are not favored in law, and as parties who seek to assert a forfeiture are generally held to the very letter of their authority, it may be doubted whether in an action between two persons this notice would be upheld by a court. The contract called for £ the judgment of the engineer in charge,’ and gave him alone ‘ power, with the sanction of the Chief of Engineers, to annul the contract by giving notice in writing to the party of the second part.’ The Chief of Engineers and the Secretary of War and the *383 assistant who signed the notice were not the persons named in the contract. The contractor was entitled to the judgment of the engineer in charge, with the sanction of the Chief of Engineers, and was entitled to ‘ notice in writing to that effect from the engineer in charge.’ ”
See also Commissioner of Pilots v. Vanderbilt, 31 N. Y. 265; United States v. O'Brien, 220 U. S. 321.
Included in the petition is a claim for large profits. The record fails to sustain the contention, and no allowance will he included in the judgment therefor.
Following Finding XXVIII, items 1, 2, 3, and 4 are allowed. The amount allowed in item 4 includes due proportion of sum claimed in item 6. The judgment, including $5,691 under Finding XXV, following the rule in the Spearin case, is for $91,992.30. It is so ordered.
Graham, Judge; Hat, Judge; Downet, Judge; and CaMpbell, Chief Justice, concur.