Booth, Chief Justice,
delivered the opinion of the court: The plaintiff, a Pennsylvania corporation, sues to recover a judgment for $72,086.52 alleged to be due it under the provisions of a war contract canceled by the Government in December 1918. Plaintiff’s principal contract with the Government bears the date June 10, 1918. This contract obligated plaintiff to rough machine 1,000 recoil forgings for 75 m/m field guns and deliver the same according to a fixed schedule of delivery, all to be completed and delivered by January 1, 1919. The plaintiff was to receive for this work $105.00 for each forging machined and the Government was to furnish the rough forgings in sufficient numbers to enable the plaintiff to comply with its contract.
Prior to the execution of the contract the plaintiff had entered into two contracts with the French Government to machine 2,020 rough forgings, the French Government agreeing to furnish a sufficient number of forgings to enable plaintiff to do so, the same to be furnished plaintiff by the Pollack Steel Company. In order to supply the French Government with the forgings exacted under its contract *412 plaintiff had enlarged and equipped its plant to the point necessary to do so. Plaintiff’s equipment and machinery was, as the record discloses, amply sufficient and adequate to enable it to meet the terms and provisions of its contracts, with the French Government.
On June 10, 1918, and prior to the execution of the contract in suit signed on that date, it was known by both parties to the same that the plaintiff, in order to supply the Government with the number of forgings required, did not possess, adequate or sufficient equipment and machinery to do so. While the subject matter of the two sets of contracts was similar, the work required to be done on the forgings to be machined was not in all respects similar. This was due to-, the fact that the rough forgings to be furnished by the Government were to be supplied by the Carbon Steel Company and under the French contracts by the Pollack Steel Company, and a difference in contour and make-up obtained,, requiring the application of different types of machinery to some extent.
The plaintiff expended for additional equipment essential to the performance of its principal contract with the defendant the sum of $44,389.07 (finding V), and this sum represents the findings of the court as to this first item in suit. The sum stated has been arrived at by allowing only such items of claim as were authorized by the contract or officials with authority to incur the expense claimed, and it represents, in our opinion, the total amount which may be legally allowable under the provisions of the contract.
On July 27, 1918, plaintiff and defendant entered into a supplemental contract by the terms of which the plaintiff' was to purchase and install additional equipment for its plant in order to increase its output, said equipment and installation of the same to cost not to exceed $56,648.00, and the Government agreed to pay for it, all of the equipment so purchased to be and remain the property of the Government, to be removed by it within a year after the performance of the contract was completed. The plaintiff purchased and installed under this contract the additional equipment authorized, and expended therefor the sum of $56,520.41, *413 and the Government reimbursed plaintiff to the extent of $51,682.54, leaving a conceded balance due the plaintiff of $4,837.87 upon this item, which balance is included in the total sum mentioned in finding V.
It is proven that the labor cost expended by the plaintiff in the installation of said equipment averaged the plaintiff the rate of $2.50 per hour. It is also proven that a Government official or officials in charge of production agreed to pay plaintiff this increased cost of labor, which could not be obtained at a less rate, but the authority of the officials so to do is not established and we cannot allow the item. Soon after the execution of the supplemental contract a conflict arose between the United States Government and the French Government. The recoil forgings were urgently needed in the prosecution of the war, and inasmuch as the Government had taken over the control of the supply of rough forgings and diverted from plaintiff’s plant forgings from the Pollack Steel Company intended for plaintiff’s use in performing its contracts with France, an amicable arrangement was imperative between the Governments of France and the United States.
This arrangement was brought about by duly authorized changes and orders from the Ordnance Department and the plaintiff, wherein it was agreed that plaintiff, irrespective of the source of supply, should machine all rough forgings furnished it and apply the first ten machined upon the French contract and all additional ones up to ten per day upon its contract with the Government. It is not denied that the Government failed to furnish the plaintiff a sufficient number of rough forgings to machine more than ten per day, which were furnished to and were to be paid for by the French Government. No forgings were ever completed for the Government, and none could have been, for plaintiff’s contracts were duly suspended on December 10, 1918, and no work thereafter performed. So far as the record discloses, the plaintiff performed its contracts to the extent possible, and could have performed the same in accord with their terms.
*414 Article V of tbe contract contained the following provision:
“ In the event of the cancellation of this contract, as in this article provided, the United States will inspect the completed articles or material then on hand and such as may be completed within thirty (30) days after such notice, and will pay to the contractor the price herein fixed for the articles or material accepted by and delivered to the United States. The United States will also pay to the contractor the cost of the component materials and parts then on hand in an amount not exceeding the requirements for the completion of this contract, which shall be in accordance with the specifications referred to in schedule 1 hereto attached, and also all costs theretofore expended and for which payment has not previously been made and all obligations incurred solely for the performance of this contract of which the contractor cannot be otherwise relieved. To the above may be added such sums as the Chief of Ordnance may deem necessary to fairly and justly compensate the contractor for work, labor, and service rendered under this contract.”
It is not contended by the defendant, as we read its brief and argument, that plaintiff is not entitled to recover under this article of the contract. The defense interposed, unless we have misconceived it, goes to what items and the amount thereof which should or should not be allowed as coming within the article, and the total amount due, in our opinion, is expressed in finding V.
The defendant in its analysis of the record segregates the expenditures made for equipment essential to perform the contracts into two divisions, and as to one, i.e., the contract of June 10, 1918, it is said the contractor did not incur the expense claimed for the purpose of performing that contract, and as to the supplemental contract the expenditure made has been repaid except the amount of $4,831.81. The record before us does not sustain the defense. The total amount expended by the plaintiff to perform the contract of June 10, 1918, was $30,218.95, exclusive of overhead and direct labor costs, etc. This equipment was later sold by the plaintiff for $11,272.50, leaving a balance of $18,946.45 due the plaintiff. No objection or protest was ever asserted against plaintiff’s right to sell this equipment as its own; *415 the Government officials never at any time preferred a claim to it, whereas, under the supplemental contract of July 27, 1918, the equipment purchased with Government funds remained the property of the Government. The Government not only claimed it, but required the plaintiff to earmark and tag it, and an armed guard was kept in plaintiff’s plant for months to assure its complete delivery to the Government, and it was taken by the Government. Therefore, we are firmly convinced that the expenditures claimed were not duplications but bona fide.
The legal defense upon which the Government relies as to the above items, as well possibly as to others, is dependent upon the following article of the contract in suit, viz, article Y, which we quote in part:
“ The decision of the Chief of Ordnance as to payments and allowances to the contractor under this article, made in accordance with the terms of this contract and with the ‘ Definition of costs ’ issued by the finance division, Ordnance Department, United States Army, dated June 27, 1917, made a part hereof by reference, will be final and binding on both parties hereto.
“ The foregoing provision with regard to payments to be made by the United States upon the cancellation of this contract shall also apply in the event that performance by the contractor of this contract is finally prevented by causes determined by the Chief of Ordnance to have been beyond the control or without the fault of the contractor.”
And articles X and XI, which we also quote:
“Article X. Except as this contract shall otherwise provide, any doubts or disputes which may arise as to the meaning of anything in this contract shall be referred to the Chief of Ordnance for determination. If, however, the contractor shall feel aggrieved at any decision of the Chief of Ordnance upon such reference, it shall have the right to submit the same to the Secretary of War, whose decision shall be final and binding on both parties hereto.
“Article XI. Wherever the term ‘ Chief of Ordnance ’ is used in this contract the same shall be construed to include the Acting Chief of Ordnance or any person designated to act as the Chief of the Ordnance Department, United States Army, or any person who is accredited as his duly authorized representative.”
*416 The legal effect of a stipulation such as is found in article Y has long since been established and followed by both this and the Supreme Court. Commencing with the decision of the Supreme Court in Kihlberg v. United States, 97 U.S. 398, decided in 1878, and continuing to the case of United States v. Mason & Hanger Co., 260 U.S. 323, the Supreme Court has uniformly held that the parties to such a contract are competent to mutually designate a particular person upon whom authority may be conferred to finally and conclusively determine the questions mentioned in article V, and that the determination of such a one may not be challenged except for actual fraud or such gross error as warrants the implication of bad faith.
The obstacle present in the application of the above rule in this case arises from the evidence in the record and from no other source. It is indisputably established that subsequent to the cancellation of plaintiff’s contract, plaintiff, on May 14, 1919, prepared and presented its claim for the sum of $47,072 22 to the Ordnance District Claims Board in Philadelphia. The record is silent as to what, if any, consideration the district board gave to the claim or what, if any, determination emanated therefrom. It is shown that the claim was received and forwarded by the Ordnance Claims Board, Philadelphia district, October 10, 1919, and reached the appeal section of the War Department Claims Board and a decision rendered thereon December 18, 1920.
Jurisdiction to consider and determine the merits of plaintiff’s claim was undoubtedly assumed by the Ordnance Claims Board, the War Department Claims Board, and the Secretary of War under the mistaken legal belief that it was a class A claim arising under the act of March 2, 1919 (40 Stat. 1272), known as the Dent Act. The contracts involved were not signed in person by the Government official authorized to sign them, his name was affixed thereto by another official, and contracts of this character, known as proxy-signed contracts, were at the time considered as of doubtful validity under section 3744 of the Revised Statutes, a law which required all contracts with the War Department to be reduced to writing and “ signed by the contracting parties *417 wilb their names at the end thereof.” The various boards erected and procedure marked out in circular #17 issued by the War Department on March 3, 1919, the day after the approval of the Dent Act, were confined exclusively to claims arising under that act and no other. The War Claims Board in considering plaintiff’s claim expressly stated:
“ This is a claim, class A, under the act of March 2, 1919, for $78,762.62, on appeal from an award of the Ordnance section. A hearing has been had upon this claim.”
It was held by the then Comptroller of the Treasury, by this court, and by the Supreme Court that proxy-signed contracts, where the authority to sign for the contracting officers appears, were not invalid under section 3744 of the Revised Statutes. Union Twist Drill Co. v. United States, 59 C.Cls. 909; United States v. Swift & Company, 270 U.S. 124. The question therefore arises as to whether the claims board, organized and given exclusive jurisdiction to adjust and determine claims under the Dent Act, possessed any jurisdiction to adjudicate plaintiff’s claim. We advert to this issue because the defendant insists that in the consideration and determination of plaintiff’s claim by the claims board it was acting as the duly appointed and accredited representative of the Chief of Ordnance under article V of the contract, and in support of this contention office order #381 issued by the Chief of Ordnance on November 2, 1918, of which we take judicial notice, so provides. The order is given emphasis and importance by the defendant, and we set it out in part as follows:
“ Contract Suspensions, Cancellations, and Claims
«I
“ ORGANIZATION
“ By Office Order #S81 there has been created a claims board in the Ordnance Department. District claims boards for each ordnance district are in course of formation. The latter shall be boards of first instance and the former shall be a board of supervisions and review and shall have such other duties as may be assigned to it.
& $ $ * %
*418 “ in
“ JURISDICTION
“ District claims hoard shall have jurisdiction over:
“ (a) The negotiation, settlement, and payment of claims of contractors arising out of the suspension of operations under, or the cancellation or curtailment of, ordnance contracts or orders.
“(b) All other claims arising out of the performance of' contracts or otherwise, which have not been adjusted prior to cancellation or completion and which are within the powers of the Chief of Ordnance to determine.
“ Provided, however, that every award or settlement of a district claims board shall be submitted for approval to the claims board of the Ordnance Department.
“ If a district board shall be in doubt as to whether or not a particular claim falls within its power to settle under existing rules and laws, a tentative settlement or award shall be made by the district claims board and submitted to the claims board of the Ordnance Department for final approval or other action.”
It is manifest from the record and the procedure adopted in the consideration of plaintiff’s claim that the boards which considered and determined it were acting independently of any delegated authority so to do from the Chief of Ordnance, or in any respect as his representative under article Y of the contract. The action taken was under the Dent Act, admittedly so, and the procedure followed was the one adopted for the determination of Dent Act cases, entirely independent of any authority emanating from the Chief of Ordnance. The plaintiff and defendant were both of this opinion, and what was done was in pursuance of a jurisdiction conferred upon the department to adjudicate and determine claims arising out of informal contracts, and plaintiff’s contract was not informal; it was a legal contract providing in express terms for the manner and method of settlements to be made thereunder and was not within the jurisdiction of the boards created under the Dent Act. Baltimore & Ohio Railroad Co. v. United States, 261 U.S. 592; Price Co. v. United States, 261 U.S. 179; American Smelting Co. v. United States, 259 U.S. 75.
*419 Paragraph (b) of Office Order #381 contains language indicating an intention upon the part of the Chief of Ordnance to delegate to the district claims board authority to make settlements such as the one involved herein. We lay aside the question as to whether under the terms of article V of plaintiff’s contract the Chief of Ordnance possesses authority to delegate his rights to a board and create the right of appeal therefrom in view of its provisions, and another question as to whether the authority to delegate his power comprehends a board or is limited to a “ person.” It is sufficient for the purposes of this case to observe that the district claims board, set up in order #381, did not, according to the present record, consider plaintiff’s claim, nor did it make any award or recommendation with respect to it. We have before us absolutely no facts which in the slightest degree warrant a finding that the Chief of Ordnance ever acted with respect to plaintiff’s claims or appointed another to act for him as his representative.
In the case of Lewman et al. v. United States, 41 C.Cls. 470, 478, this court held:
“ In the ruling of the engineer officer the claimants were entitled to the exercise of an honest judgment, weighed by the rule of reason and law. That is to say, the officer whose power as a subordinate is limited should look to the contract for his authority in directing the work thereunder, and in his interpretation thereof, as well as in any changes authorized to be made by him in the specifications, he should, keeping in view the purpose and intent of the contract, impose upon the contractor the minimum of additional work and expense.”
This identical issue was present in the case of the Sun Shipbuilding & Dry Dock Co. v. United States, ante, p. 154, and in the opinion announced the court affirmed what had been previously held in the Lewman case, supra.
The decision of this court in Winchester Mfg. Co. v. United States, 72 C.Cls. 106, is not contrary to what we have just said. The contract in that case contained express provisions authorizing the procedure therein taken by the Chief of Ordnance. The court decided that the Winchester case was not *420 a Dent Act one, and that the board designated by the Chief of Ordnance was so designated under the terms of the contract.
DEFENDANT'S COUNTERCLAIM
On July 31, 1918, the plaintiff received from the War Credits Board an advancement of $30,000 to be added to its working capital in order to expeditiously perform its principal contract of June 10, 1918, with the Government. The sum advanced and the method of its repayment are set forth in a written agreement executed between the plaintiff and the Ordnance Department. The plaintiff has not paid any portion of the principal sum advanced and admits that $30,000 and no more is a proper and legitimate set-off against any amount found due it by the court.
The controversy with respect to this item is confined to a question of interest alleged to be due thereon, and this is to be determined from the stipulations of the contract of July 31, 1918, and from no other source. This agreement-provided, inter alia, for installment payments to be made by the deduction from the gross face amount of each voucher presented by the plaintiff for supplies furnished under its principal contract, the deduction so made to be applied as credits upon the outstanding advancement until the same, with accrued interest, was repaid. It further provided that the plaintiff was to pay interest on the sum advanced at the rate of seven per centum per annum on outstanding monthly balances after the allowance of the credits for the current month, and thereafter at such a rate or rates as the War Credits Board should determine.
Plaintiff’s demand note for $30,000 was also exacted as collateral security for the advancement, payable to the Secretary of War and to bear interest at the rate of six per centum per annum. Another and important provision of the agreement recited that in the event of the termination of plaintiff’s contract, any balance due of said advancement should immediately be paid after deducting “(b) all liquidated accounts that may be due and owing under the principal agreement from the Government to the contractor.”
*421 No doubt exists that under this advancement agreement the plaintiff was to be charged with interest upon whatever balance of the $80,000 was disclosed as due after the plaintiff was credited with forty percent of the face of its monthly voucher, and interest was to be paid in this way each month until plaintiff’s indebtedness was discharged. The difficulty which arises is due to the fact that plaintiff never did furnish the Government with any machined forgings during the continuance of the contract and hence never did receive any monthly or other vouchers for payments whatever from the Government.
This situation was brought about by the failure of the Government to furnish the plaintiff any rough forgings to be machined for it, and this in turn was the result of the Government’s order to the plaintiff on July 18, 1918, directing the plaintiff to machine all rough forgings consigned to it up to the extent of ten per day and deliver the same to the French Government under the French contract, all over this amount to be delivered to the Government at the rate of ten per day. The plaintiff, as the findings show, was at no time furnished with sufficient rough forgings to machine in excess of ten per day, and these by order of the Government were delivered to the French Government upon plaintiff’s contract with France. Obviously this condition of affairs precluded an observance of the agreement for repayment of the advancement in accord with the terms of the same, and the changed condition is in nowise attributable to the plaintiff. The Government officials were wholly and directly responsible for it.
The advancement agreement determines the rights and liabilities of the parties. The demand note given was collateral thereto. This agreement entered into in the midst of the war, when munition supplies were urgent, recognized the contingency of the termination of the contract because of the ending of the war, and expressly provided therefor. Paragraph (b) of the contract entitles the plaintiff to credit for sums due it under the contract when it was terminated. True, the word “ liquidated ” is used. This was done to restrict the accounts to those due under the contract and *422 not extend it to claims for damages, etc. It is conceded by the defendant that certain sums are due the plaintiff under the contract, and it never was the intention of the parties to the contract that the plaintiff should at once repay the advancement when the same was terminated if the Government was indebted to the plaintiff. The interest provided for was to run from a balance due. Surely it was not the purpose of the contract to force the plaintiff to pay $30,000 and interest, and then when the Government’s indebtedness to the plaintiff was ascertained, to hand so much or all of it back to the plaintiff as the accounts disclosed. Standard Steel Car Co. v. United States, 67 C.Cls. 445; Morrison v. Rieman, 261 Fed. 355. The plaintiff should be charged with the $30,000 advanced and interest thereon at the rate of seven percent from July 31, 1918, to December 10, 1918, and to this extent defendant’s counterclaim, principal and interest included, is allowable, amounting to $30,752.50.
A novel defense is interposed, predicated upon the following facts: The plaintiff, as before observed, was ordered to machine all forgings sent to it, up to ten a daj^, for France, and this it did. If plaintiff received sufficient rough forgings to machine more than ten a day, the Government was to receive them at the rate of ten per day. The plaintiff did not receive enough rough forgings to machine more than ten per day. The defendant contends that inasmuch as the Government permitted the plaintiff to machine rough forgings purchased from the Carbon Steel Company and apply them on the French contract, the Government is entitled to a credit of $28,000, the difference between what the Government was to pay therefor and what France was to pay. This contention is rested upon the fact that plaintiff in machining the forgings for France and used in part the machinery purchased to perform the contract in suit, and used rough forgings furnished by the Carbon Steel Company in so doing, rough forgings which were intended for use on this contract. In other words, it is essential that the Government is not to be charged with the cost of the machinery originally purchased and intended for use to perform its contract when it was used to perform plaintiff’s contract with France.
*423 It is true the plaintiff was to receive a greater unit price for forgings from France than the Government, but the difficulty with the contention lies in the fact that the plaintiff was ordered, not permitted, to use the forgings it used in performing its contract with France, and, what is more, it was known by the Government when the order was issued that rough forgings received from the Carbon Steel Company had to be machined on machines purchased to perform the Government contract. The reason the Government did not receive what it contracted to receive and which the plaintiff could have delivered is due to its and not the plaintiff’s fault.
If the Government saw fit to divert to France the supplies due it under the contract, the plaintiff was powerless to prevent it. lYkat the plaintiff did under the order to supply the French did not cost the Government any sum whatever. France was to pay for the rough and for the machined forgings, and the plaintiff could have performed its contract with France without using the machinery it purchased to perform the Government contract, if it had received the quantity of rough forgings from the Pollack Steel Company it was entitled to receive, and which the Government prevented it from receiving. This contention takes no account of the loss occasioned plaintiff through its inability to utilize all its equipment, both for the French and American contracts.
The plaintiff had contracts with France and the Government; it had to be prepared to perform both, and it was. The machinery and equipment purchased to perform the contracts in suit were especially designed and intended for performing them; they were adequate to do so, and were not necessary for use in the performance of the contract with France, and would not have been purchased for that purpose. It was an expenditure incurred for which reimbursement was provided in the contract if the same was canceled. This is not disputed.
There is an item of $486.15 for work done by plaintiff under a duly authorized purchase order, work of a special character and not provided for in the contract. The item *424 is not contested by the defendant and will be included in the judgment.
The plaintiff is entitled to a judgment for $14,123.32. It is so ordered.
Whaley, Judge; Williams, Judge; Littleton, Judge; and Green, Judge, concur.