Whaley, Chief Justice,
delivered the opinion of the court:
Before this suit was argued and submitted to the court, Edward F. Goltra departed this life on April 2, 1939, and his qualified executors were substituted as plaintiffs. Wherever the word “plaintiff” is used in this opinion, reference is made to Edward F. Goltra and not to the substituted plaintiffs.
*68 This case was brought to the court under a special jurisdictional act, 48 Stat. 1322, which reads as follows:
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That jurisdiction is hereby conferred upon the Court of Claims of the United States, whose duty it shall be, notwithstanding the lapse of time or the bar of any statute of limitations or previous court decisions, to hear, consider, and render judgment on the claims of Edward F. Goltra against the United States for just compensation to him for certain vessels and unloading apparatus taken, whether tortiously or not, on March 25, 1923, by the United States under orders of the Acting Secretary of War, for the use and benefit of the United States; and any other legal or equitable claims arising out of the transactions in connection therewith: * * *
It will be seen that this act not only waives the statute of limitations but orders the court to hear, consider, and render judgment notwithstanding any previous court decisions and to give just compensation for the claims of plaintiff for the taking of certain vessels and unloading apparatus under orders of the Acting Secretary of War, whether the taking was tortious or not., and for any other legal or equitable claims arising out of the transactions.
When this bill was before the Committees of Congress, the Committees gave full consideration to the decision of the Supreme Court in the case of Goltra v. Weeks, 271 U. S. 536. This case involved an injunction and the Committees were aware, that the merits of the case had never been considered by the court. The Committees also had before them a letter from the Attorney General urging the passage of the bill so that the plaintiff could have his day in court on the merits of the case. The real question involved was whether the cancellation of plaintiff’s two contracts by the Secretary of War on March 3, 1923, followed by the seizure of the fleet on March 25,1923, under orders of the Acting Secretary of War, was within the terms of the contracts between the plaintiff and the defendant. The Court held that the “lessor” mentioned in the contract meant the Chief of Engineers and not the Secretary of War.
On May 28,1919, plaintiff entered into a contract with William M. Black, Major General, Chief of Engineers, U. S. *69 Army, whereby the barges and towboats still under construction were leased to the plaintiff for a term of five years after delivery of the first unit, with an option to plaintiff to purchase the fleet and pay therefor in instalments over a period of fifteen years from the exercise of the option; the rental consisted of all net earnings made by the fleet and was to be credited on account of the purchase price of the fleet. As part of the transaction plaintiff released the United States from all claims which he had against them as a result of certain engagements made for World War purposes.
On May 26, 1921, a supplemental agreement was entered into between the parties by which the plaintiff agreed to furnish, subject to the defendant’s approval, a certain tract of land and runway on which unloading facilities furnished by the lessor were to be erected. The unloading facilities were furnished by the lessor and erected on the land after the runways had been provided by the plaintiff.
On July 15,1922, the defendant delivered the 19 barges and 4 towboats.
From the time of the delivery of the barges and towboats to the plaintiff, they were operated by the plaintiff as a common carrier until December 1, 1922, when they were placed in winter quarters with the approval and consent of the District Engineer, acting for and as the representative of the Chief of Engineers. It was understood that the fleet was to remain in winter quarters until navigation could be safely resumed in the spring of 1923. During the time that plaintiff had possession of the fleet it was operated to the best advantage by him and plaintiff, as a common carrier, transported all the cargo offered that the barges were equipped to carry. There was no complaint or protest by the lessor of the operation of the fleet or the failure to accept cargo by the defendant.
On March 3, 1923, the Secretary of War transmitted to Colonel Ashburn, who was one of the officials of the Mississippi Warrior Service, which was a fleet of barges and towboats owned by the Government and operated on the Mississippi Kiver, a letter addressed to plaintiff in which the Secretary of War stated that, pursuant to the right under paragraph eight of the original contract and the supple *70 mental contract, in his judgment, the plaintiff had not operated the barges and towboats under the terms and conditions of the contract and had failed to operate them as a common carrier and declared the contract and the supplemental contract to be terminated. He requested the plaintiff to deliver the fleet and the unloading facilities to Colonel Ashburn. This letter was delivered by Colonel Ashburn to the plaintiff in Washington, D. C., during the afternoon of Sunday, March 4,1923.
On March 8, 1923, plaintiff declined to comply with the demands of the Secretary of War complaining of the unjust interferences and restrictions which had been interposed and asserted that he had complied with every demand and requirement of the Chief of Engineers who was the lessor named in the contract.
On March 22,1923, the Acting Secretary of War authorized Colonel Ashburn, as a representative of the United States, to take possession at once of all of the barges and towboats or any number that could be found. Colonel Ashburn, acting upon the above order went to St. Louis on March 25, 1923, and while plaintiff was absent took the fleet from the possession of the fleet’s employees without their consent for the use and benefit of the United States. The nature of the seizure is best described by the United States District Engineer who wired the Chief of Engineers as follows:
Col. Ashburn with the Federal Barge Line towboat Viohsburg and about forty'men arrived at Goltra fleet yesterday Sunday morning about eleven overawed Goltra’s men and towed four boats and one barge down river about six miles Stop Vicksburg left them on Illinois side, came back to St. Louis, placed four Goltra barges at Barge Line Terminal and went down river with all other Goltra barges wintered at this city * * *.
After the seizure a suit was commenced in plaintiff’s behalf in the District Court of the United States against the Secretary of War, Colonel Ashburn, and the United States District Attorney. A temporary order was obtained and the barges were returned to the jurisdiction of the court and brought to St. Louis but they remained in the custody of the defendant until September 4, 1924.
*71 After the hearing on the application for the injunction, the District Judge granted plaintiff’s request and ordered the barges returned to him. At this trial a letter from the Chief of Engineers cancelling the contract was presented for the consideration of the court on behalf of the defendant. This letter is dated April 27, 1923, several months after the cancellation of the contract by the Secretary of War and more than a month after the seizure of the fleet by the acting Secretary of War.
The case was appealed to the Circuit Court which reversed the District Judge and the case was then, taken to the Supreme Court of the United States.
On June 7, 1926, the Supreme Court affirmed the decision of the Circuit Court and the fleet was delivered to the defendant during June and September of that year. In its decision the Supreme Court held (271 U. S. 536, 548, 550):
Nor does the circumstance that, as in this case, the .lessor whose judgment is to prevail is a party to the contract alter the legal result. Of course the Chief Engineer is not the real party in interest. He is a professional expert, as such was designated as lessor, and is really acting only as an agent for the Government. * * *
* * * The right of the lessor to take over the fleet under § 8 of the contract, unless there was fraud in the judgment of termination by the Chief of Engineers, the lessor, of which we have found no evidence, is clear. We think, therefore, the injunction should be dissolved and the fleet restored to the lessor.
It will be seen that the decision of the Supreme Court was based on the assumption that the Chief of Engineers had exercised his judgment in a fair and impartial way and terminated the contract.
In the trial of the instant case it is shown' that the Chief of Engineers did not exercise his own judgment but was coerced, after the Acting Secretary of War had seized the fleet, in signing the order cancelling the contract.
The evidence is clear and convincing that the Chief of Engineers believed the plaintiff had performed his part of the contract and that there was no cause or reason which would justify him in cancelling the contract. He testified that he did not exercise his own judgment but that, when *72 the letter was presented to him for his signature, he was forced to sign.
It is apparent from the record that the Chief of Engineers did not exercise his judgment in cancelling the lease before the cancellation of the contract by the Secretary of War and the subsequent seizure of the fleet by the Acting Secretary of War.
The cases are too numerous for citation that the plaintiff was entitled to an uninfluenced decision by the Chief of Engineers and that he alone could act.
The Secretary of War had no authority under the contract to exercise the right conferred upon the Chief of Engineers and, until the Chief of Engineers had cancelled the contract, the action of the Secretary of War, in cancelling the contract, was ultra vires, and the action of the Acting Secretary of War in ordering the seizure of the fleet by Colonel Ashburn was a tortious act. Burton Coal Co. v. United States, 60 C. cls. 294, affirmed 273 U. S. 337; Williams Eng. & Cont. Co. v. United States, 55 C. Cls. 349; Michael H. King v. United States, 37 C. Cls. 428; Sun Shipbuilding Co. v. United States, 76 C. Cls. 154; Helvetia Milk Condensing Co. v. United States, 74 C. Cls. 142 and Luts Co. v. United States, 76 C. Cls. 405.
The plaintiff having been deprived of his lease and option to purchase, illegally and wrongfully, the question arises as to what compensation he shall receive.
Plaintiff only had a contract.for a léase of the fleet for five years with an option to purchase. He attempted to exercise the option to purchase but the defendant refused to comply with the provision of the contract with reference to the appointment of arbitrators to fix the value which should be paid.
During the operation of the fleet from July 1922, to December 1, 1922, the plaintiff sustained a loss. This was a new service and large expenditures had to be made for prospective business, for providing land and runways, for costs incurred for advertising the service, insurance, and for repairs and changes in the towboats. Plaintiff was prohibited from charging less than the rail rate. The loss can be well understood.
*73 It is contended by the plaintiff that, in arriving at just compensation, an offer to rent the fleet made years after the fleet had been seized and the rental value of similar vessels on the Mississippi River should be taken into consideration. These contentions cannot be sustained. Sharp v. United States, 191 U. S. 341, 348, 349; Clarke v. Hot Springs Electric Light & Power Co., 55 Fed. (2d) 612; and Sommers v. Commissioner of Internal Revenue, 63 Fed. (2d) 551.
There were no other towboats and barges on the Mississippi River at that time which could have been rented. There was no market value for the lease and option to purchase. Reproduction less depreciation or cost less depreciation are not fair bases on which to place valuation. Plaintiff is entitled to have taken into consideration what he spent in inaugurating the service and the cost of repairs and changes made to the towboats and the supplies furnished by him. Prospective profits can not be considered. No profits were made by the plaintiff during the time he had possession of the fleet from September 1924, to July 1926. This was primarily due to the fact that all shippers on the Mississippi River realized that the fleet was tied up in litigation and possession was being sought through the courts by the defendant.
As was said by Justice Butler in Standard Oil Co. v. So. Pacific Co., 268 U. S. 146, 156:
It is to be borne in mind that value is the thing to be found and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide. The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.
As the plaintiff only possessed a lease with an option to purchase and there being no market value, it is necessary for the Court, in arriving at an amount sufficient to compensate him for injuries sustained, to take into consideration all outlays made by him including the rental value of his land, and make reasonable deduction for the less time engaged and for release from care, trouble, risk, and responsibility attending a full execution of the contract. United States v. Speed, 75 U. S. 77.
*74 In Hetzel v. Baltimore & Ohio Railroad Co., 169 U. S. 26, 37, 38, 39, the court said:
* * * in such inquiries, absolute certainty as to the damages sustained is in many cases impossible. All that the law requires is that such damages be allowed as, in the judgment of fair men, directly and naturally resulted from the injury for which suit is brought. This is the rule which obtains in civil actions for damages. They have their foundation in the idea of just compensation for wrongs done.
The court quoted with approval from Baker v. Drake, 53 N. Y. 211, 220, as follows:
The proof may sometimes be rather difficult upon the question whether the damage was the just or proximate result of the breach of the covenant. In such case it does not come with very good grace from the defendant to insist upon the most specific and certain proof as to the cause and the amount of the damage when he has himself been guilty of a most inexcusable violation of the covenants which were inserted for the very purpose of preventing the result which has come about.
In Hoffer Oil Corporation v. Carpenter, 34 Fed. (2d) 589, 592, the court said:
A person who has violated his contract will not be permitted to reap advantage from his own wrong, by insisting upon proof which, by reason of his breach, cannot be furnished. * * *
A party, who has broken his contract, will not be permitted to escape liability because of the lack of a perfect measure of the damages caused by his breach. * * *
A reasonable basis for computation, and the best evidence which is obtainable under the circumstances of the case and which will enable the jury to arrive at an approximate estimate of the loss, is sufficient.
See Eastman Kodak Co. of New York v. Southern Photo Materials Company, 273 U. S. 359.
Taking all the relevant facts into consideration and after allowing the counterclaims, in making a jury award, the Court concludes that the sum of $350,000.00 is just compensation for the vessels and unloading apparatus and all *75 other claims, legal or equitable, arising out of the transactions.
Judgment is entered for the plaintiffs in the sum of $350,000.00, with interest at six percent per annum,,, not as interest but as a part of just compensation, from March 25, 1928, to the date of payment. Virginia Engineering Company v. United States, 89 C. Cls. 457.
It is so ordered.
Littleton, Judge; and GeeeN, Judge, concur.
WhitakeR, Judge; and Williams, Judge, took no part in ‘ the decision of this case.