Booth, Judge,
delivered the opinion of the court:
This is one of a group of cases wherein the plaintiffs sue for just compensation for the expropriation of ship construction contracts. The cases were argued and submitted at the same time. The plaintiffs rests the right of recovery on the Brooks-Scanlon case, 265 U. S. 106. The claim is for an award of $23,093,448.65. The defendant, in addition to the defense raised in the Brooks-Scanlon case now before the court on remand, interposes herein a defense predicated upon a contention that under the facts in this case the plaintiffs’ contracts were not expropriated, and even so, they were without value.
The plaintiff steamship company is a Delaware corporation. Its shipping interests are large. On October 2, 1916, it entered into two written contracts with the Sun Shipbuilding Company, of Philadelphia, Pa., to construct for it two twin-screw steel cargo steamships identified as Numbers 5 and 6 of an estimated gross tonnage of ten thousand tons each, at a cost of $1,390,000 for each vessel. On February 20, 1917, the contracts were modified so as to cover changes made in the original design, and the costs of the two vessels increased, comprehending in the end a final outlay of $2,808,-554 for the vessels. Payments were to be made by the owner to the contractor in installments as the work on the vessels progressed. The vessels were to be completed on or before March 1,1918, and in the event of a default in this respect a liquidated damage clause imposed upon the contractor the payment of $1,000 for each day of delay, provided that in case the delay exceeded 10 days beyond the contract period the sum of $10,000 would be remitted from any demurrage claimed, and in the event of a performance of the contract prior to the completion date fixed therein, the contractor was.to receive a premium of $1,000 per day for each day the work was so advanced. The contract among other important provisions contained the following stipulations:
“Builder agrees to deliver said steamships complete and ready for ocean service to the Owner at Chester, Pennsyl *75 vania, on or before March first, 1918, unless actually prevented by strikes, fire, flood, war in, by, or with the United States of America, or commandeering thereby, or acts of God, or by delay or failure in delivery to Builder of Turbines or Boiler's complete. * * *
“ It is hereby convenanted and agreed that the vessels and all materials, fittings, etc., delivered, bought, or ordered for the said vessels, shall forthwith as the work progresses, become the sole property of the Owner, to extent of payments made, and subject to Builder’s Lien (common Jaw and statutory) for the unpaid purchase money, and also subject to the right of Builder as against the vessels, materials, fittings, etc., and not merely personally as against Owner, to full indemnification against any loss resulting from default by Owner in carrying out the conditions of its part of this contract.”
On December 21,1916, the plaintiffs again contracted with the Sun Shipbuilding Company to construct two additional vessels of substantially the same design and under similar contractual terms and conditions, identified as vessels Nos. 9 and 10. The contract price in this instance, including changes made, was $2,888,114 for the two vessels. Payments were to be made in installments, and the date of delivery was contingent upon the completion of prior contract work then in course of performance in the company’s plant.
On August 8, 1917, the Emergency Fleet Corporation transmitted to the Sun Shipbuilding Company the telegram set out in Finding IY. This was followed by the Fleet Corporation’s letter of the same date, as appears in the same finding. Subsequently the letter1 to Mr. G. R. McDermott, set out in Finding VII, reached the Shipbuilding Company, and thereafter ensued an extensive correspondence between the Shipbuilding Company and the Fleet Corporation. The Shipbuilding Company, disavowing reluctance to aid the Government in time of war, was exceedingly loathe to give its unqualified assent to the proceedings. It steadfastly insisted upon an express indemnification against liability to the owner of the contracts requisitioned and at no time yielded to the -propositions embraced in the orders of the Fleet Corporation as originally formulated. On the contrary, negotiations were carried on be *76 tween the company and the Fleet Corporation until a date when the Fleet Corporation directed the company to proceed with construction of the vessels and payments would be made in accord with the cost of materials, labor, and reasonable overhead. This the company did until finally, on November 12, 1918, a written agreement was executed by the parties, wherein the Fleet Corporation agreed to pay for the vessels cost plus $15 per dead-weight ton. As a result of the attitude of the Shipbuilding Company and the Fleet Corporation the four vessels covered by the contracts cost the Government $6,636,832.47 more than the original contract price. The vessels were completed in the following order: No. 5, March 7, 1919; No. 6, May 21, 1919; No. 9, July 18, 1919; and No. 10, July 7, 1919. Completion of the vessels on the dates mentioned was accomplished by the employment of overtime and holiday labor at an enhanced cost; No. 5 was completed as a cargo vessel in substantial accord with the original contract to build the same; Nos. 6, 9, and 10 were diverted from the original design to combined cargo and transport vessels.
On the date of requisition, August 3, 1917, the plaintiffs had paid to the Shipbuilding Company the comparatively small sum of $339,600, so that their title to and interest in assembled materials were not extensive. Nothing whatever so far as actual structural work was concerned had been done. Plans and specifications for construction work were in process and near completion. The keel of none of the vessels had been laid and the most that can be said for the conditions- obtaining is' that a comparatively insignificant quantity of material was on hand. Orders had been placed for’ more, but not a nail had been driven or material placed to bring into being the vessels contracted for. All that had been done was the usual and customary preliminaries to actual construction work. The Fleet Corporation, as before observed, succeeded in finishing the vessels a little over a year after the contract period by the employment of large forces of labor in daily, overtime, and holiday work, at a tremendously increased price over the one specified .in the contract.
*77 The defendant, in view of these facts, first insists that because of the unwillingness of the Shipbuilding Company to agree to the terms and conditions of the Fleet Corporation’s letter of August 22, 1917, an independent agreement arose between the parties as to the construction of the vessels, and the contract between the plaintiffs and the Shipbuilding Company was ignored. No advantage was taken of its existence; no benefit accrued to the Government because of its terms; and the plans and specifications of the owners were not followed in constructing the vessels. However, when compared with the facts in the Brooks-Scanlon case and the opinion of the Supreme Court in that case it is difficult to discover any variance sufficiently vital to take this case out of the principles announced in that case. What transpired between the Shipbuilding Company and the Fleet Corporation, to which the plaintiffs were not a party, may not determine the plaintiffs’ rights. As a matter of fact, vessel No. 5 was completed substantially in accord with the original design, and while Nos. 6, 9, and 10 were materially changed, the contract provided for changes, and what was done was done by the Fleet Corporation to meet the existing emergency. What the Shipbuilding Company and the Fleet Corporation did subsequent to the requisition orders of August 3, 1917, is readily available, to ascertain the intention of the parties in entering into the relationship they did consummate, and may be worth something as showing that the Fleet Corporation did not then intend to requisition the plaintiffs’ contract, but the Supreme Court, with a similar state of facts in all important particulars before it, said: “ The direct and immediate result of the requisition orders and acts of the Fleet Corporation was to take from claimant its contract and its rights thereunder.” So the defense in this respect must seemingly fail, the Supreme Court giving effect to what was done to the exclusion of assertions to the contrary. In the Brooks-Scanlon case a subsequent contract was made for extra compensation, and in that case, as in this, credit was taken by the Fleet Corporation for advance payments made by the owner to the contractor prior to the date of requisition..
*78 The plaintiffs were the owners tracts. The Shipbuilding Company, under normal conditions, was in a position to fulfill its obligations. Therefore, it is not to be said, in view of the decision of the Supreme Court in the Brooks-Scanlon case, that these contracts were without value. What concerns us most is what sum from the record amounts to just compensation for their expropriation. The proofs disclose beyond contradiction that on August 3, 1917, all the preliminary work preceding actual construction of the vessels had not been completed. Materials and machinery for the completion of the four vessels had been ordered but not delivered; a comparatively insignificant amount was on the ground and no machinery was available. No construction work had progressed, the keels were not laid, and not a nail had been driven. The plaintiffs had paid but $339,600 towards the materials then on hand out of a total price to be paid of $5,297,068. There was not the remotest possibility of the vessels being completed within the contract period or the contract price. The vessels themselves existed only in drawings and specifications and the delivered material.
The purchaser of these contracts would have under these circumstances procured the right to have the vessels constructed by paying the deferred payments to the amount of at least $4,957,468 and securing the vessels, not on the contract date for completion but at some time then indefinite after the close of the war, the contracts expressly absolving the contractor from delays incident to war and Government expropriation. We say this advisedly because the fact is clearly demonstrated by what was done by the Shipbuilding Company and the Fleet Corporation to complete the vessels. The Shipbuilding Company, aided through the Fleet Corporation by the War Industries Board and other governmental instrumentalities, was unable to complete the vessels for more than a year after the contract date for completion, notwithstanding the fact that the Shipbuilding Company -employed additional forces of labor and kept them at work continuously overtime and on holidays, and this condition ■caused the expenditure of enormous sums of money.
*79 The necessity for doing what the Shipbuilding Company did was known alike to both prospective purchasers of ship-construction contracts and the owners thereof. The record does establish sales of ship construction contracts. They were extensively dealt in prior to June 15, 1917, and to some extent thereafter. We need not advert to a condition which everybody knows. However, one must have something to sell, for we may not close our eyes to the fact that a purchaser of a ship-construction contract on August 3, 1917, would look to the situation respecting the contract to be purchased and take into consideration the value of the con-' tract under existing conditions. The Supreme Court in the Brooks-Scanlon case enumerates with precision some of the factors going into the value and points out the factors a prudent purchaser would notice and observe before investing. Obviously a purchaser would be willing to pay more for a vessel partly or nearly completed than for one which existed on paper alone. What the owner had to sell in this case was an executory contract, a right which existed on paper, the performance of which depended absolutely upon contemporaneous and future conditions. We do not mean to say that the right and property of the owners were valueless. They did possess a substantial value. The Supreme Court, in the Brooks-Scanlon case, in pointing out certain express factors among others to be recognized in ascertaining just compensation for the expropriation of that right and property, justly recognizes that the contract right is not to be measured by the terms of the contract itself and the benefits therein conferred upon the owner but by all this and the state of affairs existing at the time of expropriation, which in the very nature of things must inevitably affect the procurement of that right.
Analyzing the facts in this case upon the rule laid down in the Brooks-Scanlon case, and giving full effect to the proof respecting values, we believe these contracts would have brought, in a fair negotiation between an owner willing to sell and a purchaser willing to buy, the sum of $800,000. To this amount must be added interest at the rate of 6 per cent, not as interest but as part of just compensation, making *80 up a sum sufficient to make the owner whole. The judgment is for the sum of $902,237.65, including interest to February-14, 1927. It is so ordered.
Moss, Judgey Graham, Judge; and Hat, Judge, concur.