Whaeey, Chief Justice,
delivered the opinion of the court:
This case comes to this court under a Special Jurisdictional Act conferring jurisdiction to—
hear and determine the claim of the Virginia Engineering Company (Incorporated), and to award just compensation for extra costs, if any, incurred in complying with requests, if any shall be found to have been made and complied with, of the Director of the Veterans’ Administration incident to the work performed under contract of June 24, 1924, for equipping the Veterans’ Administration Hospital at Aspinwall, Pennsylvania, and to enter decree or judgment against the United States for such just compensation, if any, notwithstanding the bars or defense of lapse of time, laches, or any statute of limitation. 49 Stat. 2257.
There are two questions which confront the court. The first is — was any request made by the Director of the Veterans’ Administration of plaintiff, incident to the work to be performed under plaintiff’s contract, which caused it to incur extra costs? The second is — if extra costs have been incurred through such request, is plaintiff entitled to receive not only the amount of the extra cost but an additional amount as part of just compensation to the date of payment in order to make plaintiff whole for the extra cost incurred?
The first question is one of fact; the second is one of law and is contingent upon an affirmative finding on the first question.
In 1924 the Veterans’ Bureau, desiring to establish and erect a hospital at Aspinwall, Allegheny County, Pennsylvania, entered into a contract with W. F. Trimble & Sons Co., of Pittsburgh, Pa., for the erection of the building and with Michaels Company, of Norfolk, Virginia, for the electrical work. A contract was entered into between plaintiff and defendant on June 24, 1924, whereby for the sum of $191,806, plaintiff agreed to furnish all labor, equipment and material required for the complete installation of plumbing, water distribution, and sewer system, including *468 all inside and outside gas, water, and sewer piping, fixtures, services, etc.; of heating systems with outside high pressure steam distribution and including all inside piping, radiation, outlets, etc., together with boilerhouse and incinerator equipment, in accordance with specifications, at U. S. Veterans’ Hospital, Aspinwall, Pennsylvania, the work to be completed on or before the expiration of 350 calendar days from the date of receipt of notice to proceed.
On July 23, 1924, plaintiff was notified to proceed and therefore the completion date was to be July 9, 1925.
Immediately upon the receipt of the notice to proceed plaintiff entered upon the work and began operations by working on the outside sewer system. The nature of the work under plaintiff’s contract necessarily was dependent upon the work of the contractor who was to erect the building. The progress which plaintiff could make inside of the building was dependent entirely upon the progress made by the contractor who had the contract for its erection.
The evidence shows that plaintiff brought to his work satisfactory and efficient workmen and proceeded with the work under his contract in a satisfactory and efficient way. There was no complaint about plaintiff’s work or about its workmen or the skill of its workmen. These workmen had been employed by the plaintiff for some time and had satisfactorily worked on other buildings. Plaintiff conducted an “open shop” with no labor disputes, and employed both union and non-union workers, who had become trained in their line of work through extended service with plaintiff in; installing plumbing in other hospitals and were experienced in the installation of hospital equipment.
Shortly after plaintiff had arrived in Aspinwall, representatives of the Pittsburgh Union investigated plaintiff’s labor organization, and, finding that it was not organized under the local rules which required none but union men to be employed, demanded that plaintiff discharge the nonunion men and employ solely those who belonged to the local unions in the Pittsburgh district. This demand plaintiff refused to meet and, as a result of this refusal, a “sympathetic” strike was called by the unions and the union *469 men employed on the work being performed by the W. F. Trimble & Sons Company, which had the contract for the erection of the building, and those employed by the Michaels Company were taken off the work. As a result of this strike the work was stopped on the main building as was the electrical work. Only the men employed by plaintiff continued to perform the work under plaintiff’s contract. Neither of the other contractors attempted to settle the strike or to provide other men for the work. The strike occurred on October 25, 1924.
At the request of Director Hines of the Veterans’ Bureau a “conciliator” from the Department of Labor was sent to the scene and, upon investigation, counseled the Director to call a general conference in order to bring to an end or to settle the strike and have a resumption of work on all contracts. Acting upon this advice, the Director called a conference in Washington on November 13, 1924, and wired the plaintiff to send a member of its firm to attend the conference.
When the conference was held Director Hines presided and among those present were his Director of Construction; plaintiff’s President and Vice President; a representative of W. F. Trimble & Sons Co.; a representative of Michaels Company; the Commissioner of Conciliation, Department of Labor; a representative of the Plumbers’ Local Union, Pittsburgh; the secretary of the Steamfitters’ Union, Pittsburgh; and a representative of the Master Builders’ Association, Allegheny County, Pa., and of the Building Trade Employers’ Association. General Hines called upon the various representatives to state their viewpoint. The union representatives demanded that plaintiff’s force be unionized one hundred per cent. The representatives of the other two contractors stated that they were powerless to do anything in the matter. Plaintiff’s representatives stated that work on its contract was progressing satisfactorily and that it had had no trouble with its labor and there was no strike among its men. General Hines made a vigorous speech urging settlement of the strike and insisted that the parties get together and settle their differences. *470 At that time General Hines knew that the only difference was the fact that plaintiff was operating an “open-shop” and that the unions in the county in which the hospital was being erected had demanded that plaintiff’s force be completely unionized. That was the sole issue before the conference. General Hines also knew, and was at that time informed, that plaintiff was complying with its contract and that the work was satisfactorily progressing. Representatives of plaintiff, realizing that something had to be done, suggested that plaintiff would go so far in settling the matter as to unionize fifty percent. This was refused by the union representatives. General Hines was so aroused at the refusal of the parties to get together that he vigorously asserted that the hospital had to be built, that the Veterans’ Bureau needed the cots and, unless a settlement was made, he would take over the contracts.
After the conference had adjourned plaintiff held conferences with the Director of Construction of the Veterans’ Bureau and was urged to come to an agreement with the unions in order to settle the strike and allow the work to progress. General Hines was kept fully informed by his Director of Construction of what happened in the conferences with plaintiff after the general conferences. had adjourned. After many conferences with the Director of Construction and the union representatives, plaintiff finally had to accede to the demands of the union which meant that he had to employ only union men approved by the local unions and to pay the scale of wages demanded by the unions. General Hines was informed of this by letter from the plaintiff and in reply he stated to plaintiff “You have acted very wisely in this matter” and that a settlement had been achieved when it had appeared impossible before plaintiff acceded to the unions’ demands. In the second letter Director Hines stated:
I wish again to express my appreciation of your attitude throughout the entire discussion of the situation at Aspinwall and of your action which has permitted a settlement of the matter which will permit the construction of this hospital to proceed in spite of various obstacles which you have had to overcome in order to accomplish this end.
*471 Taking into consideration all tbe facts, statements, and surrounding circumstances which caused the “sympathetic” strike; the interjection of himself into the matter by General Hines in calling the general conference and his vigorous insistence that the strike be settled; and the letter of commendation to the plaintiff stating that plaintiff had acted wisely by acceding to all of the demands of the union when he knew that by so doing plaintiff not only had to incur extra cost and expense but had to discharge faithful and efficient workers who were then on the job, it is inevitable to conclude any other way than that plaintiff acted upon the request and demand of General Hines to give way in this matter and plaintiff therefore met the demands of the union regardless what the extra cost was to it. The very threat of termination of the contracts and the taking over of the work by the Veterans’ Bureau, which General Hines made at the general conference, was in the nature of duress on plaintiff to force it to meet the demands of the union. Especially is this true when it is taken into consideration that at the very time this conference was being held, and prior thereto, plaintiff was performing its contract in a satisfactory and progressive manner and there was no strike or dissatisfaction in its labor force. No other conclusion can be drawn from the events as they occurred and culminated in the conference called by General Hines and the results which followed. In our judgment, and we have so found, plaintiff acted in response to the request of General Hines and the extra cost which it incurred was due entirely to this request for plaintiff to meet the demands of the union.
Plaintiff is entitled to recover the extra cost. We have found as an ultimate fact that plaintiff has incurred an extra expense of $71,069.65.
The Jurisdictional Act permits plaintiff to recover just compensation. This extra cost involves a loss under a contract which, ordinarily, would not entitle plaintiff to any more than the actual loss sustained. However, Congress has seen fit to grant plaintiff the right to recover not only the extra cost incurred at the time of the completion and acceptance of the work but, in addition thereto, an added sum which will make plaintiff whole to the date of payment.
*472 It has been repeatedly held by this court and the Supreme Court in numerous cases that just compensation includes not only the value of the thing taken but, in addition thereto, interest from the date of taking to the date of payment, not as interest, but as a measure of compensation. See Wheeling Steel Corporation v. United States, 71 C. Cls. 571, 572; Nitro Powder Company v. United States, 71 C. Cls. 369, 374; DeLaval Steam Turbine Co. v. United States, 70 C. Cls. 51, 67, 68, affirmed by Supreme Court, 284 U. S. 61; John Russell Smith v. United States, 67 C. Cls. 182, 210; Luckenbach S. S. Co. v. United States, 64 C. Cls. 59; Sea-board Air Line Ry. v. United States, 261 U. S. 299, 306; and William Wrigley, Jr. v. United States, 75 C. Cls. 569.
Defendant argues that when Congress used the words “just compensation” it was not intended in the sense in which it is used in the fifth amendment of the Constitution in reference to taking of private property under the power of eminent domain, but in the nature of damages sustained under a breach of contract. We can not take this view of the use of these words in the Act. It is a well-known rule of statutory construction that where judicial interpretation has been placed on the use of certain words over a lapse of time, Congress in the use of those words in subsequent statutes meant them in the light and meaning as placed upon them by the courts. In this case the use of the words “just compensation” had been employed in many other statutes by Congress and when these statutes came for determination before the courts, in every instance the courts held that they meant the value of the thing taken from the time of taking to the date of payment with an added amount to make the parties whole. There can be no other construction placed upon the use of these words. Congress has the right to give plaintiff any relief it may see fit to accord it and this case is removed from one sounding in damages to one that falls under the eminent domain class. It is a special relief granted by Congress to this plaintiff under special circumstances for the purpose of granting special recovery. The Case of the Sewing Machine Companies, 18 Wall. 553, 584; The “Abbotsford,” 98 U. S. 440, 444; United States v. Mooney, 116 U. S. 104, 106; Kepner v. *473 United States, 195 U. S. 100, 124; United States v. Merriam, 263 U. S. 179, 187; and Hecht v. Malley, 265 U. S. 144, 153.
The defendant has brought to our attention the case of Tillson v. United. States, 100 U. S. 43. This case is not apposite. The Special Jurisdictional Act in this case called for “the amount equitably due” and not just compensation. The Supreme Court held that the word “equitably” meant “no more than that the rules of law applicable to the case shall be construed liberally in favor of the claimants”, and that interest is not allowed on claims up to the time of the rendition of judgment under the Statute organizing the Court of Claims, unless the contract expressly provides for interest. We have allowed plaintiff nothing as interest, but only an amount which is included in what is meant by just compensation as interpreted by the courts.
Plaintiff is entitled to recover $71,069.65, with interest at the rate of six per cent per annum from May 2, 1925, to the date of payment, not as interest, but as a part of just compensation in order to make the plaintiff whole. It is so ordered.
Williams, Judge; LittletoN, Judge; and GreeN, Judge, concur.
Whitaker, Judge, took no part in the decision of this case.