Bobb, Circuit Judge,
delivered the opinion of the court:
The plaintiff moves for summary judgment on counte VI and VII of its petition, challenging two decisions of the General Services Administration Board of Contract Appeals. Invoking section 2 of the Wunderlich Act (41 U.S.C. § 322) the plaintiff contends that the Board’s decisions were based upon errors of law. The defendant opposes the plaintiff’s *796 motion and moves for summary judgment in its favor. Since we think the Board was correct we deny the plaintiff’s motion and enter summary judgment for the defendant on both counts.
The controversy has its origin in a contract dated January 24,1964 whereby the plaintiff agreed to furnish all labor and materials and perform all work for the construction in Washington, D.C. of Federal Office Building #7 (FOB 7) and the building for the United States Court of Claims and Court of Customs and Patent Appeals (court building) for the sum of $20,428,000. The court building was to be erected on the east side of Lafayette Square between Pennsylvania Avenue and H Streets, and FOB 7 was to be on the west side of the Square. A separate set of contract drawings, including interior “finish schedules” and floor plans, was issued for each building.
Count VI of the petition alleges that the Board of Contract Appeals erred in holding that the plaintiff was required to finish rooms and spaces not specifically mentioned in the finish schedules, but designated for finishing in the floor plans. Count VII alleges that the Board erred in holding that the plaintiff was not entitled to recover the cost of relocating a steam line which crossed the area of the court building. Since the issues presented by the two counts are distinct we discuss them separately.

COUNT VI

The floor plans indicate the location and dimensions of the rooms, vestibules, and other spaces in the buildings, and specify the finish to be applied — plaster, paint, wall covering and so on. The finish schedules also specify finishes, which are listed on the “space name section” of each schedule. In some instances, however, the floor plans specify a finish for a certain space but the finish schedule does not, and in other cases the finish specified in the finish schedule differs from that designated for the same space on the floor plans. Each finish schedule contains a note reading “In case of differences between the finish schedule and other drawings, the finish schedule shall govern.”
*797 On July 30,1965 t/he plaintiff wrote the GSA Construction Engineer, referring to the discrepancies between the floor plans and the finish schedules and requesting a determination in writing as to the finishes, if any, required for the spaces which were not listed in the space name section of the finish schedules. The Contracting Officer answered that “The finish for spaces not itemized on the Finish Schedules shall be as listed on the floor plans.” In reply the plaintiff noted its disagreement with this determination and requested the Contracting Officer to reconsider. Thereafter, the Contracting Officer ruled that:
In those cases where the floor plan drawing refers to a finish for a specific room or space but such room or space is not reiterated on the Finish Schedules, Contract Drawing 5-1, the finish required by the plan drawings is a requirement of your contract.
The Board of Contract Appeals denied the plaintiff’s appeal from this decision.
Paragraphs 2-1 (a) and 2-05 (a) of the contract’s special conditions and Paragraph 2 of the General Provisions support the Board’s decision. Paragraph 2-1 (a) requires the contractor to furnish all labor land materials and perform all work shown on the contract drawings. Paragraph 2-05(a) states: “The following items are not included in the contract: Items shown on drawings or schedules as ‘Not in Contract.’ ” The abbreviation N.I.C. is defined as meaning “Not in Contract”. Paragraph 2 of the General Provisions of the contract provides that “anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both.” Both the finish schedules and the floor plans indicate that certain areas or items are N.I.C., or are covered by a separate contract. Since the particular finishes which the plaintiff is required to apply are shown on the floor plan drawings, and since there is no statement anywhere that they are “N.I.C.”, these finishes are included in the contract work which the plaintiff is required to perform. The contention of the plaintiff would render meaningless the specification of finishes on the floor plans and the *798 indication on the floor plans that certain areas shown there are “N.I.C.”
Before the date fixed for the opening of bids the government, by amendment 4 to the specifications, added two rooms to the finish schedule for the court building. The finish for these two rooms was already designated on the floor plans. From these circumstances the plaintiff argues that the government recognized the finish schedule as controlling. We think on the contrary that the amendment, at the most, revealed ia patent ambiguity in the contract which should have alerted the plaintiff to make inquiry of the Contracting Officer. As this court said in Beacon Construction Co. v. United States, 161 Ct. Cl. 1, 7, 314 F. 2d 501, 504 (1963), “when [a contractor] is presented with an obvious omission, inconsistency, or discrepancy of significance, he must consult the Government’s representatives if he intends to bridge the crevasse in his own favor.” See also, HRH Construction Co. v. United States, 192 Ct. Cl. 912, 428 F. 2d 1267 (1970). Had the plaintiff made inquiry it no doubt would have been informed of the government’s interpretation, which we think is sound, that so long as finishes were shown for rooms and spaces on either the floor plans or finish schedules, or both, the plaintiff was required to finish such rooms and spaces; and that the finish schedules were controlling only when there were inconsistencies or conflicts between the type of finish shown on the floor plans and those specified on the finish schedules.
Considering the contract as a whole we think the Board’s decision was correct as a matter of law. We may add that as a practical matter, it hardly seems sensible to believe that the contract was intended, and should be construed, so as to leave large areas of the buildings unfinished.

COUNT VII

In Count VII the plaintiff claims that relocating a steam line which crossed the project area of the court building was not required by the contract, and that the plaintiff is entitled to additional compensation for this work.
*799 The contract provides as follows:
When utility lines serving partially demolished buildings or buildings adj acent to the site fall within the limit of project area these lines shall 'be relocated by the Contractor at no additional cost to the Government. Item No. lib of Amendment No. 7 to Paragraph 67-05, Sub-paragraph C-l.
In addition,
The Contractor’s attention is directed to the necessity •for maintaining steam service at all times to the Veterans Administration Building, 'Lafayette Building, etc. When the existing 10" h.p. steam and 4" pumped condensate return mains are in conflict with demolition and new building construction these mains shall be relocated by this Contractor. This Contractor shall be responsible for the servicing and maintenance of this piping until the permanent steam and pumped condensate mains are installed. Steam and condensate -mains shall be insulated with thickness of insulation for the service intended. Insulation shall be provided with a waterproof felt wrapper and 20 gauge metal protective cover. Item No. 11a of Amendment No. 7 to Paragraph 67-05, Subpara-graph C-2.
As we have said the court building was to be erected between Pennsylvania Avenue and H Street. The Veterans Administration and Lafayette Buildings are directly north of this area, on the other side of H Street.
Two contract drawings are important. Drawing 1-3, Utilities Survey, shows a steam line with the steam tunnel, vault and manholes and lists the government as the utility owner. The steam line on the drawing begins in the project area and ends in the middle of H Street as do other utilities shown on the drawing. Details such as the size of the line and the steam pressure are not indicated. The second drawing, Architectural Drawing 2-1, “Demolition Plan & Details”, shows an existing steam main, vaults and manholes. At each end of this line on the drawing is a “squiggly” or “S” shaped symbol, which is the standard symbol used to indicate a line that is not fully shown. The drawing refers to “Note #2” which provides that any existing utilities to be rerouted shall *800 be moved following coordination with the District of Columbia government and the utility companies.
Excavation by the plaintiff uncovered the steam line shown on the drawings, which was an active line supplying the Lafayette Building and other buildings adjacent to the site. The Contracting Officer held that the plaintiff was required to relocate this line as part of the plaintiff’s work under the contract. The Board of Appeals sustained the Contracting Officer’s decision.
We think the Board was correct as a matter of law. When the contract drawings are examined in the context of the specifications, requiring the contractor to maintain steam services to the Veterans Administration Building and the Lafayette Building, the only reasonable conclusion is that the line shown on the drawings is the one mentioned in the specifications. At the very least the drawings and the specifications together put the plaintiff on notice of the presence of an existing steam main; and if the plaintiff had any doubt about the matter it was its duty to make inquiry before submitting its bid.
Although perhaps not complete in all details the contract drawings are not inaccurate or misleading. The plaintiff contends that the government misled it by furnishing “an erroneous drawing, while withholding from it other drawings which revealed the 'actual conditions at the site.” The “other drawings”, which apparently were prepared in 1953, were not contract drawings. 'In response to the plaintiff’s request for additional information they were furnished to the plaintiff after the Contracting Officer issued his final decision. 'Since we hold that the contract drawings are not misleading, we cannot agree that the government was at fault in not producing the earlier drawings before they were requested.
CONCLUSION
We conclude that the Board’s decisions were correct as a matter of law. The plaintiff’s motion for summary judgment is denied and the defendant’s motion for summary judgment on Counts VI and VII is granted with the petition dismissed as to them.