**DANO RESOURCE RECOVERY, INC., Petitioner,**

v.

**DISTRICT OF COLUMBIA, Respondent.**

**No. 91–AA–55.**

District of Columbia Court of Appeals.

Argued Nov. 24, 1992.
Decided Feb. 23, 1993.

Gilbert J. Ginsburg, Washington, DC, with whom Philip C. Jones, Falls Church, VA, and Peter Paul Mitrano, Fairfax, VA, were on the brief, for petitioner.

Edward E. Schwab, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, DC, were on the brief, for respondent.

Before FERREN, STEADMAN and FARRELL, Associate Judges.

FARRELL, Associate Judge:

This is a petition for review of a decision by the District of Columbia Contract Appeals Board (the Board) arising from the District government's termination of a $78,084,193 contract with Dano Resource Recovery, Inc. (Dano) for the processing and disposal of sludge and solid waste. Dano appealed the termination to the Board and sought an award of damages. When the District claimed removal and reprocurement costs from Dano, Dano filed a second appeal with the Board, which was consolidated with the first.

Following 84 days of hearings and review of a vast evidentiary record, the Board upheld the contract termination in a 73–page opinion and sustained the District's claim for removal costs, but denied its claim for reprocurement costs. Dano now petitions for review of the decision upholding the termination, contending, *inter alia*, that the Board's interpretation of the contract's performance requirements and termination provision was erroneous and that its factual findings as to Dano's performance under the contract were arbitrary, capricious, and unsupported by the record.

We hold, under the appropriate standard of review, that the Board's interpretation of the performance requirements and termination provision was reasonable, and sustain it. We also find substantial evidence in the record supporting the Board's findings that Dano defaulted on the performance requirements, that its default was not waived or excused, and that the District exercised reasonable judgment in terminating the contract despite the forfeiture of Dano's substantial capital investment which this exacted.

## I. FACTUAL BACKGROUND

In March of 1982, Dano entered into a contract with the District to dispose of sludge and solid waste (referred to here collectively as "waste") by processing it into saleable compost at the District's Blue Plains water treatment facility. Dano received the contract without competitive bidding, partly in settlement of a breach of contract suit it had filed against the District for termination of two earlier waste processing contracts.[1] Under the present contract, Dano was to invest its own capital in building and operating the facility and recover its investment over time by the disposal and sale of the composted waste. Dano would lease 3½ acres from the District at the Blue Plains site, where it would build the waste processing plant. The District would pay Dano for processing and removing a fixed amount of waste, and Dano would sell a specified amount of processed compost each year, with the District sharing in the profits.

---

1. The District had terminated those contracts for Dano's alleged failure to perform preparatory construction.

To understand the performance requirements, we briefly outline the "Dano process" set forth in the contract. Dano was to receive daily amounts of waste from the District and place it in large tubular biostabilizers, which initiated the composting process by way of tumbling and aeration. The waste was to "stabilize" at a temperature of 140 degrees for twenty-four hours to help eliminate pathogens, then be discharged from the biostabilizers and sifted through grates. Any material not filtered through the grates was a "reject" to be transported to an incinerator or landfill. The remaining waste would be transported to a composting shed and held for twenty-one days at a constant temperature of 131 degrees to reach stabilization. After removal from the shed and screening to filter out unwanted matter, the compost would be hauled from the site for storage and sale.

The project described in the contract had two phases. Phase I was a ninety-day demonstration in which Dano would construct a small facility having two biostabilizers and prove the feasibility of the process.[2] If Dano failed this demonstration, it would lose its investment. If the District approved the process after the demonstration, Dano would proceed to Phase II. The first part of that phase was a seven month construction period ("pre-term phase") during which Dano would expand the facility to a full capacity plant with nine biostabilizers. It would then begin a five year term of operations to process waste into compost, increasing the output from 400 to 1,800 tons per day. All the while, Dano was to be paid for processing and removing the delivered waste from Blue Plains.

The demonstration began on September 17, 1982 and ended on December 2. While awaiting approval of the demonstration, Dano began the Phase II expansion. Although the District expressed concerns about the demonstration,[3] it formally approved the process on January 31, 1983, some two months later than the contract called for.[4] On April 11, 1983, however, the District sent Dano a letter asserting performance deficiencies and insisting that Dano bring itself into compliance within ten days. Dano responded with a letter acknowledging certain deficiencies but denying generally that it had defaulted on the contract requirements. Dano claimed that many of the stated deficiencies had been waived, were partially the fault of the District, or were beyond Dano's control. The letter proposed a complex ninety-day plan for correcting the compost removal and storage problem (including the temporary use of barges in the Potomac River), which the District reviewed and found to be unsatisfactory.

On May 9, 1983, the District terminated the contract on the ground that Dano had defaulted by failing to perform services required by the contract—specifically, removal of the compost from Blue Plains—within the cyclical required time of twenty-one days. In the termination letter the District stated:

It is now apparent that the District is confronted with an enormous problem as the result of material being stored in the compost sheds for more than 21 days. Therefore, disposing of it will be costly because it is only suitable for removal to a disposal facility such as a landfill or incinerator.

2. This phase was required because certain aspects of the Dano plant and process were unique or had not been fully tested in the United States.

3. A December 7, 1982 letter sent to Dano by the District's project administrator stated that District officials were "both surprised and disappointed at the confusion and lack of planning [we] witnessed at your facility," and required Dano to provide a detailed plan of operations, including details of waste removal, before it could proceed with further construction.

4. The delay stemmed partly from concerns about Dano's failure to comply with contract provisions requiring it to obtain hauling permits, a performance bond, a marketing report, and certification that the compost was suitable for commercial sale. Dano also had sought a one month extension of the demonstration period because of drainage problems at the site and lack of sufficient quantities of waste.

In addition to the 30,000 tons of material in the compost sheds, Dano has piled approximately 10,000 tons of other material outside the sheds. We estimate that it will cost the District at least $784,000 to dispose of this material which has been on the grounds of Blue Plains for more than 21 days. Because Dano apparently does not have the proper permits to remove the material currently in the compost sheds ... Dano is not in a position to immediately dispose of the tons of material now at Blue Plains in excess of the time permitted by the contract ...

Accordingly ... Dano has defaulted on its contract by failing to remove material from the compost sheds 21 days after the composting process began.

Appealing the termination to the Board, Dano contended that there was no contractual requirement that compost be hauled from the site after twenty-one days. It further argued that even if there had been such a requirement initially, the District had waived it; that the contract did not allow for termination for this reason in any event; and that the District's notice to cure letter was legally defective. Dano also claimed that the District's own actions contributed substantially to the default, thus excusing any non-performance. Finally, it argued that the District abused its discretion in terminating based upon a mere "technical breach" without allowing sufficient time for so expensive a project to succeed. The Board rejected all of these arguments in its comprehensive opinion.

## II. OVERVIEW OF THE CONTRACT

Since Dano's principal arguments in this court involve the Board's interpretation of the contract, an overview of the key provisions of the agreement is necessary. Entitled one "For: Disposal of Sludge and Solid Waste," the contract contains a standard preliminary section outlining "General Conditions," followed by the main body of the contract and a final section listing sixteen "Special Conditions." The main body is divided into two parts. Part I sets forth the requirements for the demonstration phase and includes the terms for lease of the property, a description of the "Dano Process," and criteria for evaluating the process after the demonstration phase. Part II explains the parties' rights and responsibilities during the five year "term contract." Part II contains two sub-parts, subsection A ("Conditions Precedent to Term Contract") describing the terms of the seven month phase-in or construction period, subsection B providing the terms for the balance of the five year contract period.

The present dispute centers around the interpretation of performance requirements in the main contract and the application of Special Condition 16, a default provision. Specifically, part I.A.3. defines the contractor's biostabilizer process to include, among other aspects:

e. *Composting:* The partially processed compost will be transported by front end loader to a hopper near the north west end of the compost shed.... The shed will be approximately 350 feet by 168 feet and will retain the partially processed compost for 21 days in piles 20 feet high. At the end of this period, the compost will be fully stabilized having been aerated and maintained at a temperature of more than 131 degrees Fahrenheit for the duration ... Once fully composted, the mixture will be loaded on trucks and hauled from the site.

Part I also requires Dano to obtain permits for hauling and off-site storage and states (in part I.E.3.) that "[d]ue to lack of space, the contractor shall not be allowed to store compost at the Blue Plains facility." Part I.F.1. provides that if by the end of the demonstration period Dano has complied with the criteria set forth in the following subsection, "the District will issue ... its notice of approval of the Contractor's disposal process," and the contract shall be extended for the term of years set forth in part II. Part I.F.2. specifies criteria which "shall be used to determine whether the Contractor has demonstrated a satisfactory process." Part I.F.2.e. requires Dano to provide a list of locations for temporary compost storage during the extended con-

tract term and written documentation, licenses or permits from the political jurisdictions authorizing storage within their boundaries.

Part II.A. ("conditions precedent to term contract") provides that "[o]n approval of the Contractor's disposal process by the District in accordance with the provisions of section I.F., the Contractor shall commence performance as follows utilizing the approve[d] disposal process." Part II.A.2. instructs Dano to continue "utilizing its proposed disposal process for approval of two biostabilizers" during the seven-month construction phase. Part II.B.2. makes the sale of compost an essential condition of the agreement and provides for termination by the District under Special Condition 16 if Dano fails to complete the sales as agreed upon. Part II.B.4. refers to specific sections of part I which "shall apply during the 5-year term period of this agreement." These include some of the performance requirements and the prohibition against onsite storage of compost, but not the specified biostabilizer process including the "composting" described above. Finally, Special Condition 14 provides that "time is of the essence of this agreement and all of its provisions," and Special Condition 16 sets forth the circumstances in which the District may terminate the contract wholly or in part.[5]

The District terminated the contract under subsection (a)(i) of Special Condition 16, permitting termination without prior notice of default and without an opportunity to cure if the contractor fails to perform the services within the specified time. In asserting Dano's failure to comply with the "approved process," the termination letter cited part I.A.3.e. requiring removal of compost after twenty-one days, and part

I.E.3. prohibiting on-site storage and requiring that hauling and off-site storage permits be furnished.

## III. DISCUSSION

### A. *Standard of Review*

On this appeal under D.C.Code § 1–1189.5 (1992), Dano concedes, as it must, that "the decision of the Board on questions of fact shall be final and conclusive" unless "not supported by substantial evidence." § 1–1189.7. Dano contends, however, that since the primary issues on appeal involve interpretation of the contract, normal principles of contract interpretation govern these issues and require this court to make an independent determination of the correctness of the Board's decision. *See, e.g., Christacos v. Blackie's House of Beef,* 583 A.2d 191, 194 n. 3 (D.C.1990). But the matter is not that simple.

With few exceptions, District contracting practice parallels federal government contract law. Thus, as in the past, we avail ourselves here of decisions of the former United States Court of Claims and present United States Claims Court and United States Court of Appeals for the Federal Circuit, as well as the federal boards of contract appeals, all of which have particular expertise in this area. *See Edward M. Crough, Inc. v. Department of Gen. Servs.,* 572 A.2d 457 (D.C.1990). Our standard of review is the same as that followed by the federal boards and courts under the Wunderlich Act, 41 U.S.C. §§ 321, 322. *See District of Columbia v. Heman Ward, Inc.,* 261 A.2d 836, 838 (D.C.1970). This Act has been held to require *de novo* review by the courts on issues of contract interpretation. *E.g., United States v. Lockheed Corp.,* 817 F.2d 1565, 1567 (Fed.

---

5. Special Condition 16(a), under the caption "DEFAULT," states:

The District may, subject to the provisions of paragraph (c) below, by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:

(i) If the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

(ii) If the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

Cir.1987); *American Electronic Lab., Inc. v. United States*, 774 F.2d 1110, 1112 (Fed. Cir.1985). Still, we have recognized that our review of all issues in a case such as this "benefits from the specialized knowledge" of the District of Columbia Contract Appeals Board, *Dano Resource Recovery, Inc. v. District of Columbia*, 566 A.2d 483, 485 (D.C.1989), whose members, in order to be appointed, must "have experience in the areas of procurement and contract law." D.C.Code § 1–1189.2(b). Accordingly, while "[a]s to questions of law … [the Board's] decision is not final or conclusive, … [n]onetheless, we give careful consideration and great respect to [its] interpretation because legal interpretations by tribunals having expertise are helpful even if not compelling." *Fruin–Colnon Corp. v. United States*, 912 F.2d 1426, 1429 (Fed. Cir.1990). *See also Wright Constr. Co. Through Rembrant, Inc. v. United States*, 919 F.2d 1569, 1571 (Fed.Cir.1990); *Alvin Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1564 (Fed.Cir.1987). This deference is especially proper in cases such as this involving mixed questions of fact and law where the Board—and we on review— must examine a detailed record of the parties' course of dealing and performance.

The upshot is that we will give "great weight" to the Board's understanding of the contract provided its interpretation "is not unreasonable," *Dale Ingram, Inc. v. United States*, 475 F.2d 1177, 1185, 201 Ct.Cl. 56 (1973); yet, bearing in mind that a default determination is a severe remedy, *H.N. Bailey & Assoc. v. United States*, 449 F.2d 387, 391, 196 Ct.Cl. 156 (1971), we must ultimately be satisfied that the District had "solid grounds" for the termination. *Hedin Constr. Co. v. United States*, 408 F.2d 424, 431, 187 Ct.Cl. 45 (1969).

Applying these standards, we first address the issues of interpretation regarding the performance requirements, the termination provision, and the necessity for a notice to cure letter. We then consider Dano's claims of waiver or estoppel, excused non-performance, and abuse of discretion bound up in the facts of this case.

## B. *The Compost Removal Requirements*

The first issue is whether, during the part II pre-term or phase-in period, Dano was required to remove compost from the site within twenty-one days. Dano contends that its failure to do so did not breach the contract because there was no time requirement for removal and the contract did not prohibit storage of compost on the Dano site. The Board determined that removal was required after twenty-one days under part I.A.3.e., and storage was prohibited by part I.E.3. as well as by Dano's obligation to obtain necessary permits for off-site storage. Dano has not convinced us that the Board's interpretation is erroneous.

Part I.A.3.e. provides in essential part: "The shed … will retain the partially processed compost for 21 days…. At the end of this period, the compost will be fully stabilized…. Once fully composted, the mixture will be loaded on trucks and hauled from the site." Dano argues that the twenty-one days was meant to be the minimum number of days the waste would be held for composting, rather than the maximum number of days it could be stored. Dano asserts that the waste was to be removed only after it had fully "composted," not after it had "stabilized"; it maintains that since different terms of a contract are normally assumed to have different meanings, "fully stabilized" and "fully composted" should not be read synonymously. Testimony before the Board did reveal that stabilization of waste normally means elimination of pathogens, while composting refers to the overlapping but distinct process of decomposition of organic materials. Dano's expert testified that the former is tied to Environmental Protection Agency standards for pathogen elimination and can take up to three days, whereas the time for composting may vary and is a matter of judgment. Although the Board found part I.A.3.e. to be unambiguous and mandatory in requiring removal once waste had fully composted after twenty-one days, Dano argues that this clause is too ambiguous to provide a legitimate basis for termination.

■ Assuming that the language of part I.A.3.e. is ambiguous, there nevertheless is strong evidence supporting the reasonableness of the Board's interpretation. We observe first that any ambiguity as to whether "fully composted" incorporates a 21–one day outer limit for the removal of the delivered waste from Blue Plains is properly construed against Dano. George Stryker, the District's administrator of the contract during the demonstration and early post-demonstration phase and the District's principal technical representative in the negotiations, testified that Dano drafted the language of part I.A.3.e. (and part I.A. generally), which was then inserted into the contract without essential modification. Dano has not disputed this in its brief, and it makes sense that Dano would draft the section outlining its composting process. Ambiguous language is generally . construed against the drafter where the parties were relatively equal in bargaining power and represented by counsel. *E.g., Intercounty Constr. Corp. v. District of Columbia,* 443 A.2d 29, 33 (D.C.1982); *see generally* FARNESWORTH ON CONTRACTS § 7.11, at 265–67 (1990). Dano would have had considerable bargaining power as regards a provision specifying its own process that was accepted by the District without substantial modification. According to Stryker, the District had informed Dano that part I.A.E.3. was "one of the most essential paragraphs" since in the District's view the twenty-one day clause "confirmed [Dano's] intent to dispose of the material." Dano was therefore on notice that the provision necessitated careful drafting.

■ In any event, viewing the entire contract and the conduct of the parties, the Board fairly concluded that the parties understood the process to require full composting and cyclical removal of the waste from the site after twenty-one days. Dano's vice-president, Henry Valentino, acknowledged in his testimony that "generally, in twenty-one days, we should have . . . [produced the compost]," and that Dano believed one advantage of its process was that it took only twenty-one days to complete, less time than traditional methods. In a draft document to obtain financing submitted during the performance of the contract, Dano described its process and stated that "[a]fter 21 days, the pile is removed to storage and/or sales." In its April 13, 1982 letter responding to the District's notice to cure, Dano used language again suggesting its understanding that compost would be removed within twenty-one days: "The delay in removal of material stored in excess of 21 days was caused, in part by. . . . We are prepared to move the material in compliance with [part I.E.3.]." [6] Such evidence of circumstances surrounding the contract formation and the parties' conduct in performing it is relevant to ascertaining their intent. *Dodek v. Cf 16 Corp.,* 537 A.2d 1086, 1093 (D.C.1988); *Alvin Ltd. v. United States Postal Serv.,* 816 F.2d 1562, 1566 (Fed.Cir.1987). Notably, too, expert testimony indicated that stabilization would normally take up to three days, not longer, which in the Board's view made it unreasonable to read the 21–day language as a minimum period for composting rather than a cyclical schedule triggering the duty to remove. *See* RE-STATEMENT (SECOND) OF CONTRACTS § 203 comment c (1981) (contract terms are to be given a reasonable rather than unreasonable interpretation).

Also significant is that the Board found that Dano's composting process did not provide for a curing phase at the Blue Plains site.[7] The Dano process described in part I.A.3.e. does not mention a curing phase, and the government's expert testified that he found no provision for curing

---

6. Further, a report prepared by officials in Prince William County on the earlier project between Dano and the District (which the District also terminated) stated that "[Dano] proposes to use the static pile method to complete the composting ... This process is far quicker than windowing and [Dano] believes it can be completed in 21 days."

7. Testimony established that to create a mature or usable compost, the process would generally include a mixing phase, a composting phase to achieve a high rate of stabilization, and a curing phase to achieve remaining or residual stabilization.

in the plant design documents.[8] Indeed, the Board found that there was insufficient land at Blue Plains for curing to take place there.[9] The absence of a curing provision buttressed the Board's conclusion that Dano intended its process at Blue Plains to be completed within twenty-one days.

Dano points to concessions by District officials that the District would not allow it to remove waste unless it was fully composted, and that the waste in fact was not fully composted after twenty-one days. It argues that since the stabilization/composting period took longer than twenty-one days under the approved "Dano process,"[10] the District's own requirements prevented removal within twenty-one days. But, as the District points out, its insistence on fulfillment of one contractual requirement—proper and complete composting—did not release Dano from the attendant obligation of timely removal. And there was testimony that District officials informed Dano regularly when the waste had "reached temperature" for twenty-one days and so was ready for removal.

Other clauses of the contract also support the Board's interpretation.[11] As explained earlier, part I.E.3. (licenses and permits) provided that "[d]ue to the lack of space, the contractor shall not be allowed to store compost at the Blue Plains facili-ty." Part I.F.2.e required Dano to obtain necessary permits for hauling and off-site storage and provide a list of temporary storage cites. These provisions confirm the reasonableness of the Board's view that part I.A.3.(e) required removal of the compost on a rotating basis after twenty-one days, not longer. Consistent failure to remove waste after that time necessarily meant that the no-storage requirement would be violated, since there was evidence that the compost sheds could not hold material longer than twenty-one days.[12]

As if to concede the link between the 21-day removal clause and the ban on storage, Dano argues that the contract did not prohibit storage of compost on *Dano's* site. It contends that the storage restriction applied only to the District's property at Blue Plains, not to the land leased by Dano (which the contract distinguished as the "demised premises"). Dano points to a January 31, 1983 contract amendment allowing it to rent an additional 2¾ acres at Blue Plains, and implies that the additional land was to be used for storing compost; this is said to rebut the District's claim that it did not want compost stored at Blue Plains. But the mere fact that the no-storage clause refers to "Blue Plains" rather than "the demised premises" does not help Dano. During contract negotiations

8. George Stryker testified that curing was not included in the process description of part I.A.3. because any curing was to be done off-site.

9. At oral argument, Dano would not concede that its process failed to include a curing period and suggested that at the time of contract formation the parties were unsure how long the curing process would take or perhaps even whether a curing period would be required. Dano, however, represented itself as having expertise in composting and negotiated the contract at full arms' length. It therefore may not assert its own lack of knowledge, as well as its apparent failure to draft a more precise removal provision, as a defense to the twenty-one day removal requirement.

10. The Board did not accept this premise, finding that Dano's failure to remove the compost after twenty-one days resulted from operational problems at the Dano facility and were not an incident or feature of the "Dano process."

11. *See generally,* FEDERAL CONTRACTS GRANTS AND ASSISTANCE, § 13.05 at 103 (D.Riley 1983) (hereaf-ter FEDERAL CONTRACTS) ("The entirety of a written contract represents what the parties agreed to, rather than its individual clauses or sections").

12. The designer of the Dano plant testified that his design was based upon the assumption that waste would be continually removed after having composted for twenty-one days, since the Dano site had no space available for storage—it was "such a tight site."

Moreover, a January 27, 1982 Memorandum of Understanding sent to Dano's vice-president acknowledges the imperative nature of the no-storage requirement: "During the 5 year performance period, Dano will remove all compost from Blue Plains exceeding the capacity of the compost shed or the District may terminate the contract." Thus, since the compost shed could not hold material for much longer than twenty-one days, Dano had to remove waste on a cyclical twenty-one day schedule in order to avoid an accumulation of compost exceeding the shed's capacity.

the parties referred to the Dano site as "Blue Plains"; Dano's vice-president did so (specifically referring to the removal and no storage requirements) in a January 27, 1982 Memorandum of Understanding sent to the District concerning the proposed contract. Moreover, interpreting the storage prohibition to apply only to the unleased remainder of Blue Plains would prohibit storage merely in an area where Dano was not allowed to operate in any case.[13]

We therefore agree with the Board that part I.A.3. required removal of compost from the Dano site on a rotating basis after twenty-one days.

### C. Effect of the Incorporation Provision

■ We next consider Dano's argument that the removal provision, found in part I of the contract, was not incorporated into part II relating to the post-demonstration phase. Dano points out that the criteria set forth in part I.F.2. for approval or rejection of its composting process do not include a 21–day requirement, and argues that *this* process—one satisfying the criteria of part I.F.2.—is what the parties

meant to carry forward into the post-demonstration phase. Dano also points to part II.B.4. ("applicability of other sections") which delineates those provisions of part I that were to be incorporated into part II, and which does not include the 21–day requirement.

Dano does not explain how the contract's purposes would conceivably be advanced by requiring it to remove waste after twenty-one days only during the demonstration period but not thereafter.[14] Dano contracted to provide "a satisfactory *disposal* process," part I.F.2. (emphasis added); the entire contract is captioned one "For: Disposal of Sludge and Solid Waste." Leaving the removal schedule to Dano's judgment for the length of the term contract is incompatible with the key importance of the 21–day requirement during the demonstration phase.[15] The Board reasoned that while the incorporation clause did not explicitly carry forward the removal requirement into part II, it made no sense to read that provision as applying only to the demonstration phase. Part I.A.3. is the only contract provision fully describing the Dano plant and process.[16] In the Board's

13. Dano also argues that had the parties intended the storage restriction to apply to the Dano site, they would have included it within the "Site Use" provision (part I.D.) instead of as one among a list denominated "Incidental Provisions." That argument is unpersuasive to begin with given the explicit language of the prohibition, and as the District also points out, it made sense to combine the no-storage requirement with an additional requirement that Dano keep its worksite clean and odor-free likewise contained in the Incidental Provisions.

We also reject, as did the Board, Dano's argument that the hauling and storage provisions meant only that Dano could not store the compost after it had been processed, and that while it was awaiting screening outside the compost shed it was not being "stored" but was still being processed into saleable compost. This redefinition of storage would give Dano open-ended leave to retain large amounts of waste on the site until, in its sole judgment, the processing had been completed.

14. Wallace White, Administrator of the District's Water Resources Management Administration, testified that "it was our understanding from the beginning that the contractor would continue to take and process sludge because the sludge comes out every day. There was no way we could have gone into an agreement that would

have given a break.... We have to move sludge every day." The District's concerns about storage of compost and other material, repeatedly conveyed to Dano, were heightened because of consent decrees that had been imposed on the District as a result of environmental and public health problems at the Blue Plains facility.

15. We note too that the incorporation provision (part II.B.4.) applies literally to "the 5–year term period," *not* to the "7–months phase in period" (when Dano defaulted) which was a "[c]ondition[ ] precedent" to commencement of the "term contract." Although the incorporation provision by its terms applies only to the term contract, we nonetheless must consider it since the parties have litigated the case assuming the applicability of the provision, and the Board's opinion likewise does so.

16. Part I.A.3. provides dimensions of the biostabilizers and their turn rate, the required temperatures, the manner in which sludge and solid waste are to be mixed and aerated, etc. The Board found this type of detail to be indicative of design and performance specifications. *See Monitor Plastic Co.,* ASBCA No. 14,447, 72–2 BCA ¶ 9626, at 44,970–71 (1972) (design specifications often provide precise technical informa-

view, part I.A.3 contained process specifications of the type normally found in government contracts and which, to make them meaningful, had to be read to govern the entire contract. *See Blake Construction Co. v. United States*, 202 Ct.Cl. 794, 796–97 (1973) (contract interpreted as a whole in order to render meaning to the specifications section). The Board also found that the phrases "disposal process" and "approved disposal process" in part II refer to the process specifications in part I.A.3., including the removal requirement, since otherwise the phrases would have no meaning. A judgment of this sort is, we believe, one particularly implicating the Board's expertise.

Dano counters that the "approved disposal process" refers to the process approved under the criteria of part I.F.2., which do not mention the 21–day requirement. In Dano's view, upon successful completion of the demonstration "Dano was to be judged solely on its ability to sell the end product produced." The Board rejected this argument, however, because it would largely leave the District without performance standards by which to judge Dano's timely processing and removal of waste after the demonstration period. That Dano was also to be judged by its ability to sell the compost does not undermine the Board's conclusion that reading the term contract to exclude performance requirements critical during the demonstration phase would "produce an absurd result."

### D. Application of Special Condition 16: Default Termination

 The District terminated the contract under Special Condition 16, permitting ter-

mination if—as pertinent here—Dano either (a) failed "to perform the services within the time specified" by the contract or (b) failed to perform any other contract requirement and did not cure that failure within 10 days "after receipt of notice from the Contracting Officer specifying such failure." Despite the facially broad reach of this provision, Dano contends that Special Condition 16 is purely procedural (in essence a notice provision) and could be invoked only if Dano failed to *sell* compost in the amounts and time specified in part II.B.2. This is so, Dano argues, because part II.B.2. is the only clause in the main contract referring to Special Condition 16. The Board was not persuaded by this argument, nor are we.

Subsection (a)(i) of Special Condition 16 (failure "to perform the services" within the time specified) permits termination without opportunity to cure. The sales provision (part II.B.2.), however, refers only to subsection (a)(ii) of Special Condition 16, which requires notice and a ten-day opportunity to cure. Dano's interpretation thus appears to leave subsection (a)(i) without application, for if a default in sales was the only basis for cancellation during the five-year term, subsection (a)(i) would never apply.[17] But Dano argues that termination was the subject of careful negotiations between the parties, and that given the size of its investment and the District's termination of previous Dano contracts, Dano wanted assurances that the contract could only be cancelled in narrow circumstances, which would not include a rigid

---

tion; performance specifications provide operational characteristics.)

**17.** Dano asserts that making Special Condition 16 applicable to all contractual provisions yields unreasonable results. It points out, for example, that if Special Condition 16 applied to part I of the contract (the demonstration phase), it would conflict with language in part I.F.1 precluding termination until completion of that phase. But since the contract states that the main contractual provisions control over any Special Condition (see Special Condition 10), any specific termination language they contain would override conflicting language in Special Condition 16.

We also reject Dano's argument that Special Condition 16 was, in effect, written out of the contract by a January 31, 1983 amendment to part I.E.4. drafted by the District, permitting the District to dispose of any waste Dano was unable to process and to deduct the costs of doing so from payments to Dano. It is too great a leap to regard this as a *substitute remedy for* default termination rather than an alternative remedy agreed to by the District. The Board found that this amendment was meant to apply to Dano's "short-term inability" to accept waste rather than to its long term inability to remove compost from the site; nothing in the record permits us to disturb that conclusion.

time requirement that any number of contingencies could make impractical.[18] The very fact, however, that the parties negotiated the subject of termination carefully undercuts Dano's argument that Special Condition 16(a)(i) was, in effect, boilerplate or surplusage and furnished no independent basis for termination. If the default provision as inserted did not accord with Dano's intent, it was Dano's responsibility to seek its modification or deletion.

Dano further argues that even if Special Condition 16 independently governs termination, Dano was not in default as defined by that clause. The District terminated under subsection (a)(i) which allows termination if the services are not performed "within the time specified herein or any extension thereof." The phrase "time specified" in government contracts generally refers to the time stipulated for producing the "end product" of the contract. *E.g., Bailey Specialized Bldgs., Inc. v. United States*, 404 F.2d 355, 360–62, 186 Ct.Cl. 71 (1968); *Dubrow Electronics Indus., Inc.*, ASBCA No. 8464, 65–1 BCA ¶ 4859 (1965) (term "perform the services" contained in standard government default clause refers to "end item" of contract, not to intermediate performance). Dano claims that even if the 21–day requirement applied to part II of the contract, it is not a "specified time period" relating to an "end product" as those terms are properly understood. Dano asserts that the main purpose and thus "end-product" of this contract was the production of saleable compost, not removal of compost from the shed within twenty-one days.[19]

The Board rejected this interpretation for reasons we have already outlined. The contract was one for "*disposal* of sludge and solid waste" (emphasis added). Part I.C. sets forth the price to be paid Dano for "each ton of sludge accepted *and disposed of,*" and part II.A.2. declares that Dano "shall accept *and dispose of*" the waste delivered to it (emphases added). George Stryker testified that the District did not consider the waste "disposed of" if Dano only accepted and processed it merely to store it at Blue Plains; the District was *paying* Dano to process and dispose of waste. While Dano's ability to produce saleable compost was undoubtedly key to its receiving the contract and so was made an "essential condition" of the agreement, the Board rejected a reading that would make sale of compost the "end product" to such an extent that the removal and no-storage requirements could not be enforced by termination. That judgment was reasonable.[20]

Finally, Dano argues that reading Special Condition 16 to permit termination for a substantial breach of the 21–day removal clause leads to an irrational result: "The practical import . . . is that Dano's $15,000,-000 investment would have been at risk every day, and would have been dependent on whether a biological process would al-

---

**18.** As an example of the parties' care in negotiating termination, Dano points to their agreement to delete the standard termination for convenience clause, which would have let the District terminate for any good faith reason. *See generally* FEDERAL CONTRACTS, *supra* note 11, § 18.01, at 327. The District responds that there were unrelated reasons why a termination for convenience clause was not appropriate for this type of contract, but we find it unnecessary to enter this dispute.

**19.** Dano asserts that the latter requirement would essentially represent a delivery contract under which Dano was to "deliver" compost from its site to a storage facility on a daily schedule.

**20.** Dano points to case law holding that termination for failure to meet a delivery schedule is proper only when the contract clearly states that the contractor is to make deliveries at specified

deadlines, *see, e.g., Novelty Prods. Co.*, ASBCA No. 21,007, 78–1 BCA ¶ 12,989 at 63,336, 63,340 (1978); *Dubrow Electronics Indus., Inc., supra*, thus providing an objective standard upon which the contractor can rely. *Bluff's Dairy, Inc.*, ASBCA No. 18,969, 74–2 BCA ¶ 10,836 (1974); *see also* 48 C.F.R. §§ 52.212–1 to .212–2 (federal acquisition regulation prescribes the format and language for a delivery clause, illustrating that exact delivery dates must be specified). Dano asserts that no "delivery clause" was included in this contract. The Board found, to the contrary, that the contract contains a delivery timetable: removal on a rotating basis after the twenty-one day composting period. Simply because compost was to be removed on a continuous and cyclical basis does not mean the 21–day removal clause lacked the necessary specificity.

ways occur on schedule." The Board, Dano says, viewed the agreement as "an installment contract for five years' worth of daily 'deliveries' of material," a contract "exposing Dano to a risk of loss of its entire investment every day if it failed to move material off its site on precisely the 21st day after it was placed in the compost shed." This argument would have serious merit if there was evidence that the District or the Board read the contract to permit termination for failure to remove a given quantity of waste "on precisely the 21st day" after placement in the shed. Even a contract with a time-is-of-the essence clause, such as this contained, must be read reasonably. But as our discussion in part III below demonstrates, this is not a case where the District authorities "strenuously insist[ed] upon the performance of the contract by [Dano] in accord with its exact letter," nor where they did so "while at the same time ignoring its terms themselves." *Williams Engineering & Contracting Co. v. United States*, 55 Ct.Cl. 349, 382 (1920). Twenty-one days was the contractual benchmark by which completion of composting and removal of waste deposited in the shed was to be measured, but the District did not terminate for Dano's failure to remove waste immediately after any composting cycle. Rather, the Board found that it did so only after Dano's continuous and (literally) mounting failure to remove waste in violation of both the time and no-storage provisions, presenting the government with environmentally serious and costly problems of waste accumulation. In light of the proven limits upon the District's ability to store waste at Blue Plains, the Board reasonably construed the contract as making repeated non-compliance with the removal requirement grounds for termination under Special Condition 16. Those failures represented substantial non-performance by Dano. *Franklin E. Penny Co. v. United States*, 524 F.2d 668, 676, 207 Ct.Cl. 842 (1975).[21]

### E. *Factual Claims*

Besides its claims involving contract interpretation, Dano argues that the District waived or modified any time requirement for the removal of compost; that Dano's failure to remove compost is excusable because of actions by the District; and that the District acted arbitrarily (and pretextually) in ending this unique private-public venture involving a huge capital investment without giving it an adequate chance to succeed. As each of these contentions is bound up in the particular facts of the case, Dano's burden in showing reversible error by the Board is formidable. *See* D.C.Code § 1–1189.7; *District of Columbia v. Heman Ward, supra*, 261 A.2d at 840.

### 1. Waiver of Time Requirement for Compost Removal

During the demonstration phase, the parties agreed orally that Dano could screen the finished compost on site before hauling it away. Dano began on-site screening in November 1982 after purchasing a screen from the District, and continued the practice through the demonstration period into the pre-term phase of the contract. The District approved of the demonstration while Dano was stacking compost outside the shed for on-site screening. Dano argues that the parties' oral agreement constituted a waiver of any contractual requirement that compost be removed from the site after twenty-one days, since on-site screening necessarily added several days to the pre-removal period.[22]

■ Two elements must be satisfied to show a government waiver of a delivery

---

21. In view of our conclusion respecting the propriety of termination under Special Condition 16(a)(i), we do not reach the District's alternative argument that the termination also complied with Special Condition 16(a)(ii). See note 5, *supra*.

22. There was conflicting testimony as to the amount of additional time required for screening, with estimates ranging from no additional time to three days. The District asserted that Dano had often failed to screen the material at all, simply stockpiling it outside the compost shed. It informed Dano in an April 20, 1983 letter that "during our visit of the site, we have found the overwhelming part of the stored material to be *unscreened* and at best partially composted sludge" (emphasis added).

schedule:[23] "(1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent." *DeVito v. United States*, 413 F.2d 1147, 1154, 188 Ct.Cl. 979 (1969).[24] Dano claims that it relied on the District's approval of on-site screening, and that its detrimental reliance far exceeded that of a typical contractor in view of its continued capital investments in plant construction. The latter point is not insignificant, for the government has a greater burden to act expeditiously when the contractor continues to incur expenses in performing a contract. *See* FEDERAL CONTRACTS, *supra* note 11, § 16.19, at 288 (citing *Westinghouse Electric Corp.*, ASBCA No. 20,306, 76–1 BCA ¶ 11,883 (1976)). On the other hand, there is obvious tension between this requirement and the government's duty not to act precipitously in declaring a default termination. See part III.E.3., *infra*.

■ The Board found that the District had not relinquished its right to insist on timely removal of the waste. The Board gave weight to the parties' conduct in the months preceding termination, including actions by the District that put Dano on notice that the removal requirement would be enforced. The District approved the demonstration (including on-site screening) only after expressing reservations about Dano's performance and receiving its continued assurances that it would obtain the needed permits for hauling and off-site storage. In a December 7, 1982 letter, the District repeated its concern about removal and storage, and during negotiations after approval of the demonstration had been recommended, it again stated its dissatisfaction with the stockpiling of compost and Dano's failure to obtain transport and storage permits.

The Board's rejection of the waiver argument is justified. During the four months between approval of the demonstration and termination, the District insisted on compliance with the removal, no-storage, and permit requirements. Contrary to Dano's assertion, the District did not "change the rules on the contractor without giving the contractor adequate notice time," which might have required a limited period of forbearance while Dano adapted to the new schedule. *DeVito*, 413 F.2d at 1154. The four month forbearance period before termination was reasonable given the experimental nature of the disposal project, *Warner Industries, Inc.*, ASBCA Nos. 13,461, 13,511, 70–1 BCA ¶ 8151 at 37,896–892 (1970) (delay of several months reasonable to give contractor opportunity to come into compliance); *see H.N. Bailey*, 449 F.2d at 391 (what constitutes reasonable forbearance period depends on circumstances of case), and was also reasonable given Dano's repeated assurances that it would achieve compliance after it had "fine-tuned" its process following the demonstration period. "The Government is habitually lenient in granting reasonable extensions of time for contract performance, for it is more interested in production than in litigation." *DeVito*, 413 F.2d at 1153.

### 2. Excused Non–Performance

Dano contends that the Board ignored evidence that any non-performance on its part was caused by the District's failure to fulfill its responsibilities under the contract, thereby excusing Dano. *See Williams Engineering*, 55 Ct.Cl. at 381 (government may terminate contract for default only when it does not materially contribute to the circumstances giving rise to the default). Dano maintains that the District provided it with sludge that had too high a water content, violating the contract term that the sludge contain no more than 80% water. The District was also

---

**23.** Dano, of course, bore the burden of persuasion on this issue. *See generally* FEDERAL CONTRACTS, *supra* note 11, § 16.13, at 274.

**24.** These elements are essentially the same as those found in traditional equitable estoppel doctrines, *viz.*, (1) acts by the other party which induce reliance, (2) foreseeable reliance on the inducement, and (3) actual detrimental reliance. *See* FARNESWORTH ON CONTRACTS § 2.19, at 137 (1990).

responsible for maintaining a dewatering system and leachate pond to prevent flooding of the site. Dano claims that this system malfunctioned for twelve days during January 1983, causing flooding of the Dano site and portions of the compost shed, and in turn preventing waste in the shed from reaching the minimum temperature for composting. According to Dano, these problems forced it to keep waste in the compost sheds for an extended period of time.

■■■ As formulated by one leading commentator, "[a] default termination will stand unless government interference or other excuse equals or exceeds the contractor's delinquency." FEDERAL CONTRACTS, *supra* note 11, § 16.18, at 283.[25] *See also Allied Contractors, Inc.*, IBCA No. 265, BCA ¶ 3591 (1962) (default termination upheld since government's delays were minor and not the cause of contractor's delayed performance). Whatever the precise standard, there is ample evidence in the record supporting the Board's finding that the default resulted from Dano's own failures, not the District's. Part I.A.1. of the contract required the moisture content of the sludge to be approximately 80%, on average, and there was evidence that the sludge provided by the District deviated on average only two or three percentage points from the 80% goal. There was likewise evidence that the periodic failure of the dewatering system did not contribute to Dano's general failure to remove compost. Dano failed to remove compost during prolonged periods even when the pump was functioning properly. Also, the pump malfunctions apparently affected only small portions of the compost shed, and then only during January 1983. By the time the District issued its notice of deficiencies on April 13, 1983, a great quantity of compost—unaffected by the pump malfunctions occurring months earlier—had not been removed. Dano also had failed to remove rejected material that was to be

hauled away from the site for incineration. Pump failures, as the Board found, were thus largely independent of Dano's default.

■■■ Dano next claims that unusually severe weather conditions and several power outages hindered the screening and removal process. Special Condition (16)(c) excused non-performance for events "beyond the control and without the negligence of the contractor," including "unusually severe weather." The District asserts that the adverse weather occurred months before contract termination, and that the failure to remove compost resulted from Dano's own negligence in not covering the screening area. The Board agreed and properly found that Dano's own negligence in this regard could not excuse its default. *See* FEDERAL CONTRACTS, *supra* note 11, § 16.14, at 273. Dano took no steps to prevent the compost's exposure to the elements and thus cannot claim that that exposure excused its delayed performance. *Id.; Deloro Smelting & Refining Co. v. United States*, 317 F.2d 382, 161 Ct.Cl. 489 (1963) (avoidable delay not excusable). Even if Dano were excused temporarily, it still ultimately had to "complete the work within a reasonable time," *Camp Sales Corp. v. United States*, 77 Ct.Cl. 659, 664 (1933), which it did not do; as the Board found, months after the adverse weather conditions abated it still was not removing compost in timely fashion.[26]

### 3. Abuse of Discretion and Bad Faith

■■■ Dano's final argument is that the District abused its discretion in terminating this joint venture in "privatization" involving a major capital investment for essentially technical violations without giving the project a chance to succeed, and that the reasons cited for termination were pretextual. Even disregarding Dano's alarums about the threat the District's decision poses to future such public-private ventures (cries properly directed to the political branches of government), we recog-

**25.** Dano again has the burden of showing that its default was excusable. *See* FEDERAL CONTRACTS, *supra* note 11, § 16.18, at 283.

**26.** Moreover, Dano did not establish that the weather was "unusually severe" by way of com-

parison data with previous years. *See Allied Contractors, Inc.*, BCA ¶ 3591 at 17,868.

nize that termination is a severe remedy and thus a decision to terminate must be made in utmost good faith and cannot be arbitrary or capricious. *Darwin Constr. Co. v. United States*, 811 F.2d 593, 597 (Fed.Cir.1987). The requirement of good faith and sound judgment underlying termination has "special application for a default-termination which has the drastic consequence of leaving the contractor without further compensation," *Schlesinger v. United States*, 390 F.2d 702, 709, 182 Ct.Cl. 571 (1968), or results in forfeiture of capital assets, *Williams Engineering*, 55 Ct.Cl. at 381–82. Dano in this case has lost some or all of its investment in the plant.

As our previous discussion makes clear, however, we simply are not convinced that the Board erred in finding that the District terminated for substantially more than "technical" violations. Waste removal was a fundamental term of the contract. Throughout the negotiations and performance by the parties, the District repeatedly asked for and received assurances that Dano would comply with the removal and related requirements. A default termination is appropriate if in the best interests of the government, provided it is fully justifiable under the circumstances. *Udis v. United States*, 7 Cl.Ct. 379 (1985); *Science Management Corp.*, EBCA No. 289–5–83, 84–2 BCA ¶ 17,319 at 86,302 (1984). And, as we have noted, if the government waits too long before terminating (while, as in this case, the contractor continues to invest), it opens itself to claims of waiver and detrimental reliance of the kind Dano also asserts in this case. Termination here followed a pattern of recurrent assurances from Dano that it would comply with the removal, no-storage, and permit requirements, followed by its failure to do so—all of which convinced the District that Dano would not forseeably be able to overcome the defects in its opera-

tion.[27] These problems began during the demonstration phase and continued until termination. By that time Dano had allowed 40,000 tons of material to accumulate, much of which had been there since December 1982. This tonnage, which became known as the "Dano pile," was odorous and the accumulating rejects attracted rodents. The pile of material also interfered with plant operations generally and prevented construction of the additional biostabilizers. In addition, the District had received complaints from the Virginia Department of Health about Dano's illegal hauling and dumping of waste in Virginia, and Fairfax County officials had complained about odors from the rejected material that piled up on the site because of Dano's failure to carry out routine removal.

As to Dano's pretext argument, while a reviewing court may indeed inquire into the motives for termination, *e.g., Darwin Constr.*, 811 F.2d 593, 596–598 (Fed.Cir. 1987), a claim of pretext or bad faith requires "irrefragable proof." *Kalvar Corp., Inc. v. United States*, 543 F.2d 1298, 1301, 211 Ct.Cl. 192 (1976), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). To support its claim, Dano notes that before approving the demonstration the District tried to negotiate a significant reduction in the amount of sludge it would furnish Dano. It also suggests that the District was intent on ending the contract well before actual termination since in March 1983 it set up a task force to plan the phase-out of the project and instructed its site monitor to stop preparing daily logs for Dano's operations.

Although the Board did not deal expressly with the claim of pretext and bad faith, it found that the District cooperated in manifold ways in attempting to make the project succeed despite its mounting diffi-

---

**27.** District official Wallace White testified, "If [Dano] had not been able to comply with the contract in the last year, what would give us any assurance that they would be able to do it in the next 25 days[?]." Former Administrator Stryker also noted that "if [Dano] couldn't process the material on site with two tubes, when they only had two nights with their total requirement to handle ... they never would have been able to handle [the volume of a] nine tube [plant]," particularly since there was no space available for Dano to enlarge the compost sheds or store compost on site, which previous experience had shown it would need to do to accommodate a full nine tube operation.

culdes. Moreover, the government decided to terminate only after extensive consultation among officials from various departments (and with legal advice from the Corporation Counsel), and only after giving Dano repeated opportunities to cure deficiencies. Perhaps the last straw, in the District's view, came at a March 15, 1983 meeting where Dano informed District officials that it could only accept and process waste for two more weeks if off-site storage space was not obtained. As District official Wallace White testified:

> [We asked Dano] what would happen, on a worst case, if they didn't get a permit, and how much more they would be able to accept if they continued in the present mode, and they said two weeks … We were all in a state of shock. That was the last thing we expected to hear….
>
> [W]e had been assured continuously since the beginning of the contract that they would be able to get the permits, they would be able to manage the material, that they would find off-site locations to meet the requirements of the contract, and that sort of thing, and then to get this kind of reversal, all of a sudden saying we can only go for two more weeks, with no warning of anything else;

with that kind of indication it meant to us that we had to begin to start to think about some sort of contingency plan or approach to handle the sludge which continuously comes out seven days a week, twenty-four hours a day. So the whole question of disposal, of being able to dispose of the sludge, was brought into question, and all of that was in jeopardy. That sort of created a crisis in our minds, or the potential for a crisis.

Still, the District did not terminate until almost a month after notifying Dano formally of deficiencies on April 11, 1983, to which Dano responded with a complex ninety-day plan the District found unworkable.[28]

In these circumstances, the Board was justified in concluding that the District acted deliberately and responsibly in terminating the project.

*Affirmed.*

---

**28.** The plan would have required substantial assistance from the District, which would have had to provide a storage site for 30,000 tons of compost and permit the use of barges in the Potomac River for storage. It also necessitated obtaining off-site storage permits of the kind Dano had failed to obtain in the past. Since the plan contemplated aerating the compost at another site and then bringing it back to Blue Plains, it apparently would not have produced the ultimate result required—permanent removal of the accumulated compost from the site.

Dano cites as proof of bad faith the District's withholding of payments before contract termination. *See Pigeon v. United States,* 27 Ct.Cl. 167 (1892) (government may not withhold payments as means of assuring contract compliance). The Board concluded, however, that the District was justified in withholding Dano's payments because (unlike in *Pigeon*) it was not receiving the benefit of the services it was paying for, the timely disposal of waste. This was not a case, as in *Brooklyn & Queens Screen Mfg. Co. v. United States,* 97 Ct.Cl. 532, 543–544 (1942), where the contractor was only "slightly behind schedule"; and the District had ample reason to believe Dano could not bring itself into compliance within a reasonable period of time.